THE STATE, Respondent, vs. CHICAGO & NORTHWESTERN
RAILWAY COMPANY, Appellant.

SAME, Respondent, vs. CHICAGO, ST. PAUL, MINNEAPOLIS
& OMAHA RAILWAY COMPANY, Appellant.

SAME, Respondent, vs. MINNEAPOLIS, ST. PAUL & SAULT
SAINTE MARIE RAILWAY COMPANY, Appellant.

SAME, Respondent, vs. CHICAGO, MILWAUKEE & ST. PAUL
RAILWAY COMPANY, Appellant.

*March 24—June 21, 1906.*

APPEAL. (1) *Review: Questions considered.*

TAXATION OF RAILROADS. (2–16) *History and construction of statutes:
License fees in lieu of taxes: Constitutional rule of uniformity
does not apply.* (10–12) *Return of gross earnings: Approval
by railroad commissioner: Effect.* (13) *Power to revoke license.*
(14, 15) *Decision in Mil. & Miss. R. Co. v. Waukesha Co. 9 Wis.
449.* (17) *Ordinary tax not a debt.* (18–26) *Privilege taxes in-
volve contract obligations: Not taxes in constitutional sense.*
(21–23) *Impairing obligation of contracts: Amending corporate
charters.* (26) *Foreign and domestic corporations.* (27–32) *Pen-
alty for nonpayment of tax or license fee: Excusable default:
Mistake in making return of gross earnings: Construction of
penal statute: Intent of legislature.*

1. Where the right of a matter to be determined upon appeal, with
the logical basis therefor as regards legal principles, cannot
be clearly discovered and satisfactorily stated without such a
broad view of the matter as to include important matters of
difference in other pending or known to be impending litiga-
tion, though the same were not presented by counsel, through
oversight or otherwise,—that broad consideration of the case
should be taken, rather than that justice in the particular case
should be jeopardized or left in any uncertainty as to the
grounds for the result reached. pp. 470–473.

2. Ch. 74, Laws of 1854, the original act in this state for obtaining
public revenue from railroads, is the same, in all essential fea-
tures, as secs. 1211 to 1214, inclusive, Stats. 1898, except as
modified by ch. 174, Laws of 1860. p. 475.

3. The sections of the present statutes mentioned, except as they
have been displaced by the *ad valorem* method of obtaining rev-
enue from railroad companies, have not been changed except by

State v. Railway Cos. 128 Wis. 449.

ch. 308, Laws of 1899, providing that the license shall issue only on approval by the railroad commissioner of the return required by sec. 1211.  p. 481.

4. The original law did not impose a tax on railroad property, or a tax at all, within the meaning of sec. 1, art. VIII, of the constitution, though it did impose a tax "in the just and proper sense of that term" in that it imposed on the owners of property the duty of contributing, indirectly, on account thereof to the public revenue.  pp. 484, 485, 490.

5. The basic ideas of the law of 1854 are (1) an exemption of railroad property from ordinary taxation, such as is dealt with by the constitutional provisions on the subject; (2) an exaction, tax so called, in lieu thereof and in consideration of the exemption, based on the business in which the property is used. pp. 490, 491.

6. The idea that an exaction in lieu of taxation mentioned in the constitution is such taxation in fact, is a palpable *non sequitur*. p. 490.

7. Ch. 174, Laws of 1860, in connection with a companion enactment, neither, however, referring to the other, preserved the features of the law of 1854 as regards an exaction from the owner of railroad property, based on the business of the road, in lieu of and as compensation for exemption of such property from ordinary taxation—that under the constitutional provision referred to—but omitted all features giving rise to the controversy as to whether it was the latter, and added those features suggested in previous opinions in this court, as giving such an exaction the character of compensation for the privilege of operating the road.  pp. 493–496.

8. Sec. 1212 of the Statutes imposed an absolute obligation on every railroad company doing business in this state, to pay to the latter the proportion of gross earnings mentioned in sec. 1214, as compensation for the privilege of operating its road.  p. 500.

9. The other features of secs. 1211 to 1214, inclusive, are administrative in character, and intended only to secure certainty of performance as to the obligation created by sec. 1212.  p. 503.

10. The purpose of the return of gross earnings required by sec. 1211, is to enable the state to determine the proportion of such earnings to which it is entitled as compensation for the privilege accorded of operating the road for the ensuing year, and, though approved by the railroad commissioner, it is only *prima facie* binding as to the real right of the matter.  p. 503.

11. The duty of the railroad commissioner under the law of 1899, as to approving the return of gross earnings made under sec. 1211, is administrative in character.  The legislative idea is that the

State v. Railway Cos. 128 Wis. 449.

return, only when approved as required, shall be *prima facie* evidence of the correct basis for determining the amount to be paid to the state. p. 480.

12. The law of 1899 contemplates that the approval of the return shall precede the application for the license. p. 478.

13. The power of revocation of the license, reserved in sec. 1212, is exercisable in case of any default in performing the obligation created by such section and acceptance of the privilege. p. 514.

14. The statement of points decided by this court as to whether ch. 74, Laws of 1854, imposed a tax in a constitutional sense, which appears in vol. 9 of the official reports at page 449, is a *verbatim* copy of the decision of the question made by this court November 17, 1855. pp. 491, 492.

15. The determination so made as to the law of 1854 not imposing a tax "within the meaning of the constitutional provisions" has been the settled law of this state since 1862, and so far as the features of such law, in letter or spirit, are included in secs. 1211 to 1214, inclusive, such decision establishes the character thereof as regards whether they deal with taxation in a constitutional sense. pp. 497, 498.

16. The character of the law of 1854 as regards not imposing a tax "within the constitutional provisions" is emphasized in secs. 1211 to 1214 aforesaid, in that by exclusion and inclusion the idea of a tax in a constitutional sense was carefully omitted therefrom and repelled by its affirmative features, and the idea of a privilege tax resting on contract obligations was included. p. 496.

17. A tax in the ordinary sense is not a debt: it does not involve any element of contractual obligation and is not enforceable by ordinary remedies for the collection of debts, without statutory authorization in that regard. pp. 485, 500–503.

18. A privilege tax involves contract obligations. The acceptance of the privilege implies a promise to pay the statutory equivalent therefor, and the obligation may be enforced by ordinary remedies for the enforcement of ordinary contract obligations. p. 500.

19. The ideas involved in a privilege tax are these: The state offers a privilege on condition of being compensated therefor. The acceptance of such offer creates a contract. The law operating upon the acts of the parties raises the implied promise to pay the required compensation. The full consummation of the transaction involves the exchange of equivalents, the same as in any other case of an executed contract. p. 500.

20. The privilege tax exacted from a corporation for opportunity of conducting its business in this state is not within sec. 1, art. VIII, of the constitution. It is referable to the taxing power

in the general sense, the contracting power, the right reserved to amend corporate charters, and the right to exempt property from taxation.  pp. 505, 507.

21. The grant of a charter to a corporation and its acceptance create a contract between the grantor and the grantee, within the protection of the constitutional inhibition as to laws violating the obligations of contracts.  p. 505.

22. The contract between the corporation and the state, made as aforesaid, is subject to alteration under the power reserved in the constitution to alter or amend corporate charters, which is deemed to be embodied in every such charter.  p. 505.

23. When a corporate charter, originally or by amendment under the reserved power of the legislature in that regard, conditions the exercise of a corporate privilege upon the corporation paying to the state a proportion of its income, the acceptance of the charter, originally or as amended, by operating under it, creates a contract between the state and the corporation.  The exaction, when plainly made for revenue, is a tax in "the just and proper sense of the term:" in the broad view which includes all public revenues derived from persons, natural or artificial, but is, at the same time, a debt, not a tax in the constitutional sense: a tax merely involving the reciprocal duties between sovereign authority and those enjoying its benefits.  pp. 505, 509.

24. Sec. 1212 of the Statutes imposes an obligation for payment to the state by every railroad company of the full stated percentage of its gross earnings, as a consideration for the privilege of operating its road.  The acceptance of the privilege creates a debt to the state for the full amount thereof.  pp. 500, 506.

25. Upon acceptance by a railroad company of the offered privilege to operate its road by actually operating the same, the obligation to pay the stated compensation therefor becomes fixed, rests on contract, and is fully redeemable only by fully paying the same, as in case of any other absolute obligation to pay money.  p. 506.

26. There is no difference, as regards the contract basis, between exactions from foreign corporations and those from domestic corporations for the privilege of doing business in this state.  p. 505.

27. A penalty imposed by the statute for failing to perform a legal duty as regards payment of a tax, strictly so called: a tax not involving any contract element, when incurred becomes, in effect, a part of the tax, and cannot be avoided whether the default be excusable or inexcusable from a moral standpoint.  It cannot be forgiven at all, any more than the tax itself, in the absence of legislative authorization to that effect.  pp. 498, 499.

State v. Railway Cos. 128 Wis. 449.

28. The pecuniary penalty feature in sec. 1214, enforceable in respect to failure to pay any portion of the compensation due the state from any railroad company for the privilege of operating its road, being an instrumentality for the enforcement of a tax characterized by a contractual obligation to pay it, it does not necessarily follow from such a default that the penalty is collectible regardless of whether such default is excusable, testing the matter by principles of natural justice.  pp. 511, 512.

29. In case of a penal statute in aid of the enforcement of contractual obligations, such strict construction thereof in favor of the party upon which it bears is permissible as will avoid so reading it as to violate principles of natural justice, in the absence of unmistakable language in the act to the contrary.  Such a statute if necessary to avoid manifest oppression may be construed by quite as arbitrary a rule as is applied to a penal feature in an ordinary contract.  p. 512.

30. When the literal sense of a statute, if adopted as the legislative meaning, would lead to some absurd result, or shock the ordinary sense of justice, it is to be rejected, if some other meaning which is reasonable can be readily read therefrom by the aid of any rule for judicial construction which is applicable, and can reasonably·be seen to be the real intent of the legislature. pp. 512, 513.

31. The pecuniary penalty of $10,000 for any default specified in sec. 1214,—as applicable to mere mistakes of law or fact or both, not involving inexcusable neglect or moral turpitude, or difference of opinion fairly warranting resort to judicial assistance for the discovery of the truth,—would be so unreasonable as to strongly suggest that no such purpose was intended by the legislature, in the absence of language unmistakably showing to the contrary.  p. 515.

32. The term "absolutely forfeit," as used in sec. 1214, does not so unmistakably show as aforesaid.  It may reasonably be read as meaning that in case of the penalty being incurred by reason of a default not attributable, reasonably, to excusable mistake of law or fact or both, or some controversy fairly warranting resort to judicial aid for its solution, the forfeiture shall be absolute as in case of a penalty in aid of the collection of an ordinary tax, or stipulated damages in aid of an ordinary contract.  pp. 515, 516.

[Syllabus by MARSHALL, J.]

DODGE, J., concurs in the judgment on the one ground that sec. 1214, Stats. 1898, should not be construed as imposing a penalty in case of an entirely innocent mistake of fact or law

in a *bona fide* effort to comply with secs. 1211, 1212. Beyond this one point he considers the discussion contained in the opinion of the court immaterial and unnecessary. He looks upon the imposition of license fees under these statutes as "taxation" within the meaning of sec. 1, art. VIII, Const., and dissents from the doctrine that contractual obligations are involved therein. pp. 517, 518.

CASSODAY, C. J., concurs in the judgment, but dissents from so much of the opinion as holds that the exactions from railroad companies under the license system were not "taxes" upon property, within the meaning of sec. 1, art. VIII, Const. p. 519.

APPEALS from judgments of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Reversed.*

The purpose as to each of the four causes is to recover $10,000 as penalty under sec. 1214, Stats. 1898, for noncompliance with the law relating to payment to the state of the percentage of defendant's gross earnings, due the state for 1903 under sec. 1213, Stats. 1898. The complaint by appropriate allegations stated a cause of action under such section. Issues were joined in due form and the truth of the matter as to the questions thus raised was found by the court in accordance with written stipulations filed. Such facts, as so stipulated, are as follows:

"1. The defendant in making its statement of its gross earnings for the calendar year 1902, as a basis for computing its license fee of 1903, payable to the state, omitted therefrom gross earnings amounting to a substantial sum earned in the year 1902, and failed and neglected to pay to the state any portion of the license fee on gross earnings so omitted from said statement, but the officers of defendant, who made such statement of its earnings, shall be deemed to have testified in this case that, in respect of such omissions from defendant's statement, they acted and relied upon advice of counsel, learned in the law, to the effect that the items so omitted did not constitute gross earnings under the statute; which advice they believed. The plaintiff, for the purpose of this case only, makes no contention to the contrary of such testimony, but objects to the consideration of the same as incompetent and immaterial. The defendant

now admits that some of the items so omitted from said statement constituting of themselves a substantial sum were in fact gross earnings.

"2. The gross earnings of 1902, which defendant reported in 1903, pursuant to sec. 1211, Stats. 1898, and on which it did pay four per cent. to Wisconsin for its license fee for 1903, included in the total of $14,893,720.29 of earnings set forth in such report the sum of not less than $7,000,000 of earnings from interstate transportations of passengers and freight, which were only partly in Wisconsin, and such portion of interstate earnings credited to Wisconsin was derived by attributing to Wisconsin such part of the total interstate earnings on the transportation of passengers and freight across the state or from points outside to points within the state, or *vice versa,* in such proportion as the carriage in the state bore to the whole miles of carriage, both without and within the state, in each instance.

"3. If the defendant was not required to pay to the state of Wisconsin as a part of its license fee four per centum on the gross earnings from interstate business, as ascertained in the manner stated in paragraph 2, then it did pay for its license fee of 1903 more than four per centum on its full gross earnings.

"4. The defendant did pay to the state treasurer of Wisconsin under secs. 1211–1213 for its license for 1903, four per centum on its gross earnings, as set forth in its report to the state treasurer, after such report had been approved by the railroad commissioner, pursuant to ch. 308, Laws of 1899; and defendant paid to the treasurer of Wisconsin in proper time the full license fee named in the license which was issued to defendant for 1903, including the second instalment thereof.

"5. Defendant has paid, without objection, to the state of Wisconsin for its licenses of successive years issued under secs. 1211–1213, Stats. 1898, on its interstate earnings apportioned to Wisconsin in the manner described in paragraph No. 2, since the year 1876, continuously; and in making its report of earnings of 1902 defendant proceeded upon the same interpretations of secs. 1211–1213, and upon the same views of the various questions as to what were gross earnings under said statute, as it had entertained and acted upon for many years.

"6. Copies of the following three papers, viz.: Defendant's report of its gross earnings made to the treasurer of Wisconsin in February, 1903; defendant's report to the railroad commissioner of Wisconsin made in 1903; the license issued by the treasurer of Wisconsin to the defendant for the year 1903, are attached hereto and made a part of this stipulation of facts.

"7. During the year 1902 defendant was a railroad corporation doing business in this state as well as eight other states and earned upwards of $3,000 per mile upon its operated road in this state.

"8. The facts admitted in the pleadings in this action shall be considered as a part of this stipulation."

On such facts the court found in favor of the plaintiff in each of the four causes for the full amount claimed. Judgment was entered accordingly, and the defendants severally appealed.

For the appellant *Chicago & Northwestern Railway Company* there was a brief by *Edward M. Hyzer* and *Burr W. Jones,* attorneys, and *Lloyd W. Bowers,* of counsel, and oral argument by *Mr. Bowers* and *Mr. Hyzer.* They argued, among other things: (1) This action stands only on the language of sec. 1214, defendant not being punishable unless the case comes within that section. And the section must be construed strictly, both because it is part of a tax law and because it is highly penal. *State v. Pullman's P. C. Co.* 64 Wis. 89, 101–104; *State ex rel. Abbot v. McFetridge,* 64 Wis. 130, 140; *Dean v. Charlton,* 27 Wis. 522; *Dean v. Borchsenius,* 30 Wis. 236, 244; 2 Lewis's Sutherland, Stat. Constr. (2d ed.) §§ 522–527; *State v. Huck,* 29 Wis. 202; *Rietz v. Foeste,* 30 Wis. 693; *Crumbly v. Bardon,* 70 Wis. 385; *Coleman v. Hart,* 37 Wis. 180. (2) The just and true construction of sec. 1214 is that, when the proper officers of the state approve a railroad report of earnings (either as made or as modified to meet the requirements of those officers), and a license is issued by the state treasurer to the railroad, no penalty is incurred by the railroad unless it

fails to pay the amount of fee which the approved report and the license call for. Any statute must be interpreted, if it can be, so as to avoid unreasonable or unjust consequences. *Hartford v. Northern P. R. Co.* 91 Wis. 374, 377; *Wis. Ind. School v. Clark Co.* 103 Wis. 651, 659. How unreasonable and unjust sec. 1214 is if it means what is claimed by plaintiff's attorneys: that defendant is liable under it to $10,000 fine and to forfeiture of its charter if it paid one dollar too little for its license of 1903, though it made a report of ·earnings, and that report was made honestly and without purpose to defraud the state, and though that report was approved by the officers authorized by the state to pass upon its correctness and sufficiency, and though those officers issued a license to defendant on the basis of the approved report, and though defendant paid the full amount demanded by those officers and named by them in the license as due the state! For a few judicial illustrations of troublesome and uncertain questions arising under a gross-earnings tax law, ·see *State ex rel. C., M. & St. P. R. Co. v. McFetridge,* 56 Wis. 256; *State v. Pullman's P. C. Co.* 64 Wis. 89; *State ex rel. Abbot v. McFetridge,* 64 Wis. 130; *State v. St. P., M. & M. R. Co.* 30 Minn. 311; *People ex rel. N. Y. C. & H. R. R. Co. v. Morgan,* 168 N. Y. 1, 60 N. E. 1041. Sec. 4, ·ch. 308, Laws of 1899, amending sec. 1212, Stats. 1898, gives the railroad commissioner power to grant or refuse his approval of the statement made by a railroad company, and so constitutes him a special tribunal to determine, on behalf of the state, the sufficiency of the reported earnings. He really acts like an ordinary assessor; the only difference being that the railroad commissioner assesses (*i. e.* determines the amount of) earnings of property, while the ordinary assessor determines value of property. Similar dis-·cretionary, or *quasi*-judicial, power is given, not only to as-·sessors generally, but to the most various official bodies; and their decisions, within their jurisdiction (*i. e.* when on a

question belonging to them, and not wrong in law, and not unreasonably inattentive to the evidence in the same way and degree as requires a court to set aside the verdict of a jury), are final and binding even upon the courts. *State ex rel. Stearns L. Co. v. Fisher,* 124 Wis. 271, 102 N. W. 566, 567; *State ex rel. Cook v. Houser,* 122 Wis. 534, 560, 561; *State ex rel. Coffey v. Oconomowoc,* 104 Wis. 622, 629; *Madden v. Kinney,* 116 Wis. 561, 569; *State ex rel. Buchanan v. Kellogg,* 95 Wis. 672; *State ex rel. Moreland v. Whitford,* 54 Wis. 150, 153. The following cases involved decisions by boards of review concerning assessments for taxation: *State ex rel. N. C. Foster L. Co. v. Williams,* 123 Wis. 61, 64, 65; *State ex rel. Vilas v. Wharton,* 117 Wis. 558, 562; *State ex rel. Smith v. Gaylord,* 76 Wis. 306, 310. The same doctrine, of the finality of decisions, within their jurisdiction, by special tribunals created by statute for the purpose of such decision, has wide illustration in decisions elsewhere. *U. S. v. Arredondo,* 6 Pet. 691, 729; *Baldwin v. Stark,* 107 U. S. 463; *Lee v. Johnson,* 116 U. S. 48; *Wright v. Roseberry,* 121 U. S. 488, 509; *U. S. v. Cal. & Oreg. L. Co.* 148 U. S. 31, 43, 44; *Barden v. Northern P. R. Co.* 154 U. S. 288, 327; *Catholic Bishop v. Gibbon,* 158 U. S. 155, 166; 2 Freeman, Judgments (4th ed.) § 531; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421, 434, 435. (3) If sec. 1214 imposes the penalty in case the fee paid by a railroad to the state is too small—though it is what the railroad commissioner and the state treasurer, in passing on the railroad report and issuing the license, pronounce correct and sufficient,—it is only when the railroad makes a dishonest report, in a purpose to cheat the state. In other words, sec. 1214 imposes the penalty for fraud in the railroad's report, not for honest mistake. *Cohn v. Neeves,* 40 Wis. 393; *Wright v. E. E. Bolles W. W. Co.* 50 Wis. 167; *Schumacher v. Falter,* 113 Wis. 563; *Johnson v. Huber,* 117 Wis. 58; Maxwell, Interp. Stat. 77; *Reg. v. Tolson,* L. R. 23 Q. B. D.

168; *Wallace v. Finch*, 24 Mich. 255; *Batchelder v. Kelly*, 10 N. H. 436; *State v. Luther*, 8 R. I. 151; *Palmer v. State*, 45 Ind. 388; *Hopton v. Thirwall*, 9 L. T. Rep. N. S. 327; *Hearne v. Garton*, 2 E. & E. 66; *Core v. James*, L. R. 7 Q. B. D. 135; *State v. Botkin*, 71 Iowa, 87; *Russell v. Irby*, 13 Ala. 131; *Ex parte Ah Hoy*, 23 Oreg. 89; *McDonald v. Montana W. Co.* 14 Mont. 88; *Bradley v. People*, 8 Colo. 599.

For the appellant *Chicago, St. Paul, Minneapolis & Omaha Railway Company* the cause was submitted on the brief of *Solon L. Perrin*, attorney, and *Thomas Wilson*, of counsel. They argued, among other things: (1) The language of the statute is irreconcilable with the contention of counsel for the state, that the failure of the defendant—by mistake either of law or fact—to include in its "statement" or to pay taxes on every item finally determined to be "gross earnings" within the meaning of the statute, subjects it to such penalties. The language, "if the railroad company shall neglect," etc., is significant. As to the meaning of the word "neglect," see *New York G. & Ind. Co. v. Gleason*, 53 How. Pr. 122, 124; *Woodhouse v. Jenkins*, 9 Bing. 431, 441, 442; *Johnson v. Huntington*, 13 Conn. 47, 50; *White v. State*, 123 Ala. 577, 26 South. 343, 346; *Merrifield v. Cobleigh*, 4 Cush. 178, 184, 185. The mere fact that under the construction contended for by the state a railroad company is subject to a forfeiture of $10,000 and of all its rights, privileges, and franchises for an omission against which no ordinary intelligence or human foresight could guard it, is a conclusive argument against such construction. *Greene v. Greene*, 2 Gray, 361, 364; *Merrifield v. Cobleigh*, 4 Cush. 178, 184, 185; *Crane v. Hyde Park*, 135 Mass. 147, 149; *Manhattan T. Co. v. Davis*, 23 Mont. 273, 58 Pac. 718, 720; *Hooper v. Wells, Fargo & Co.* 27 Cal. 11, 85 Am. Dec. 211, 222; *Duryee v. New York*, 96 N. Y. 477, 495, 496; *Russell v. Allerton*, 108 N. Y. 288, 292; *Lawe v. Hyde*, 39 Wis. 345, 360; *Jacobs v. Spalding*, 71 Wis. 177, 190. Whether cer-

tain items are or are not properly "gross earnings" cannot
·certainly be determined by any one until the court of last
resort has finally spoken. See *State ex rel. Abbot v. Mc-
Fetridge,* 64 Wis. 130; *State v. St. P., M. & M. R. Co.* 30
Minn. 311; *Lehigh Valley R. Co. v. Pennsylvania,* 145 U. S.
192; *Hanley v. Kansas City S. R. Co.* 187 U. S. 617. The
railroad commissioner having been authorized to and re-
quired to examine and approve or disapprove the "statement"
·of gross earnings (sec. 4, ch. 308, Laws of 1899), his ap-
proval is conclusive of its correctness, in the absence of any
fraud or mistake. *Wilcox v. McConnell,* 13 Pet. 498, 511;
*Marquez v. Frisbie,* 101 U. S. 473, 476; *U. S. v. Cal. & Oreg.
L. Co.* 148 U. S. 31, 43, 44; *Lamont v. Stimson,* 3 Wis. 545,
553; *Johnson v. Towsley,* 13 Wall. 72, 83, 84; *Quinby v.
·Conlan,* 104 U. S. 420, 425, 426; *Smelting Co. v. Kemp,*
104 U. S. 636, 645; *Wiseman v. Eastman,* 21 Wash. 163,
57 Pac. 398; *Baldwin v. Stark,* 107 U. S. 463, 465; *Barden
·v. Northern P. R. Co.* 154 U. S. 288, 327; *Hill v. McCord,*
195 U. S. 395, 400; *Catholic Bishop v. Gibbon,* 158 U. S.
155, 166. The rule of these cases is equally applicable to
·every officer who acts in a judicial or *quasi*-judicial capacity,
no matter what the act or who the officer may be. *State ex
rel. Cook v. Houser,* 122·Wis. 534; *Stanley v. Albany Sup'rs,*
121 U. S. 535, 550; 2 Freeman, Judgments (4th ed.) § 531;
·2 Cooley, Taxation (3d ed.) 1464, 1467; *People ex rel.
Myers v. Barnes,* 114 N. Y. 317, 323–325; 23 Am. & Eng.
Ency. of Law (2d ed.) 375–377; note to *Flournoy v. Jef-
fersonville,* 17 Ind. 169, in 79 Am. Dec. 468, 472–476;
*Weaver v. Devendorf,* 3 Denio, 117; *Stewart v. Case,* 53
Minn. 62; *People ex rel. Ulster Co. v. Kingston,* 101 N. Y.
82, 94; *Empey v. Plugert,* 64 Wis. 603, 612; *People v. Bar-
tels,* 138 Ill. 322, 27 N. E. 1091, 1092.

*John B. Sanborn* and *Alfred H. Bright,* for the appellant
*Minneapolis, St. Paul & Sault Sainte Marie Railway Com-
pany,* argued, among other things: I. The statutes provid-

ing for the gross-earnings tax on railways, called a license fee, also provide a way for ascertaining and determining the amount of the tax before the tax receipt, called a license, is issued. The penalty for the nonpayment of the tax or license fee has reference to an amount previously ascertained and determined according to law and which is known to the treasurer as the "fee," one half of which must be paid as a condition precedent to his issuing the license. Assuming that the legislature has not provided any other method or means for ascertaining the amount of the license fee or tax, see, as to the force and effect of the return made in this case, which was accepted by the treasurer and on which he issued the license, *Matheson v. Mazomanie*, 20 Wis. 191; *White v. Appleton*, 22 Wis. 639; *Phillips v. Stevens Point*, 25 Wis. 594; *Lawrence v. Janesville*, 46 Wis. 364. But, in view of the duty and power conferred upon the railroad commissioner by the act of 1899, he is essentially a board of review having the full power and authority to determine the amount of the assessment, and, being such, his decision in that behalf was clearly judicial. *Steele v. Dunham*, 26 Wis. 393, 396. We have, therefore, not only the sworn statement of the railroad company, which prior to 1899 was, within the principle of the cases cited *supra*, conclusive, but we have in addition to that the judicial approval of such return by the officer clothed with ample jurisdiction and power to ascertain and fix the amount as a board of review. And in the cases at bar we have the record showing that all this was done and that the licenses were issued as required by law and that the tax levied by the statute was fully paid. And to say in view of such conditions that any penalties or forfeitures attach under sec. 1214, is certainly to travel outside the principles of law settled by this court and to clearly go beyond the statutes.

II. Statutes providing forfeitures for nonpayment of taxes are construed strictly against the state. *Partinglon v. Att'y Gen.* L. R. 4 H. L. 100, 122; *U. S. v. Wigglesworth*, 2 Story,

369, Fed. Cas. No. 16,690; *Millett v. Mullen,* 95 Me. 400,
49 Atl. 871; *State ex rel. Abbot v. McFetridge,* 64 Wis. 130,
140. Statutes imposing penalties for an act or omission are
generally construed as making such imposition only when
the action is in bad faith. Such has been the holding in vari-
ous classes of cases. (1) Where statute imposed a penalty
for the making of a false return for taxation. *Ratterman v.
Ingalls,* 48 Ohio St. 468, 28 N. E. 168; *Ohio Farmers' Ins.
Co. v. Hard,* 59 Ohio St. 248, 52 N. E. 635; *Kloss v. Comm.*
103 Va. 864, 49 S. E. 655; *Harris v. Comm.* 81 Va. 240,
59 Am. Rep. 666; *The Ben R.* 134 Fed. 784. (2) Where
statute imposed a penalty for failure to satisfy judgment or
mortgage. *Schumacher v. Falter,* 113 Wis. 563, 89 N. W.
485; *Johnson v. Huber,* 117 Wis. 58. (3) Statutes impos-
ing penalty for trespass. *Cohn v. Neeves,* 40 Wis. 393;
*U. S. v. St. Anthony R. Co.* 192 U. S. 524, 24 Sup. Ct. 333;
*U. S. v. Homestake M. Co.* 117 Fed. 481, 54 C. C. A. 303.
(4) Statutes imposing penalty for false returns by corpora-
tion. *Pier v. Hanmore,* 86 N. Y. 95; *Bonnell v. Griswold,*
89 N. Y. 122; *Felker v. Standard Y. Co.* 150 Mass. 264, 22
N. E. 896. (5) Miscellaneous statutes imposing penalties.
*Core v. James,* L. R. 7 Q. B. D. 135; *Hearne v. Garton,* 2
E. & E. 66. III. The defendant acted in good faith in mak-
ing its return of gross earnings. Where a person acts under
advice of counsel, such action is *prima facie* in good faith.
*U. S. v. Homestake M. Co.* 117 Fed. 481, 54 C. C. A. 303;
*U. S. v. St. Anthony R. Co.* 192 U. S. 524, 24 Sup. Ct. 333;
*Boyd v. Royal Ins. Co.* 111 N. C. 372, 16 S. E. 389; *Smith
v. Sherman,* 113 Iowa, 601, 85 N. W. 747; *Schumacher v.
Falter,* 113 Wis. 563; *Selden v. Cashman,* 20 Cal. 56, 81
Am. Dec. 93; *Myer v. Hart,* 40 Mich. 517; *U. S. v. Ninety-
nine Diamonds,* 139 Fed. 961. Sec. 1211 requires every
railroad company to make to the state treasurer each year a
"true statement" of its gross earnings. While the penalty
imposed by sec. 1214 is not in terms for failure to make such

true statement, yet the meaning of the word "true" in sec. 1211 would be persuasive as to the construction of the penalty section; for if the company does render a true statement, the inference would be that no penalty would be imposed. See *Moulor v. American L. Ins. Co.* 111 U. S. 335, 4 Sup. Ct. 466; *Globe Mut. L. Ins. Asso. v. Wagner,* 188 Ill. 133, 58 N. E. 970, 52 L. R. A. 649, 80 Am. St. Rep. 169; *Cochran v. U. S.* 157 U. S. 286, 15 Sup. Ct. 628; *Agnew v. U. S.* 165 U. S. 36, 17 Sup. Ct. 235; *Dorsey v. U. S.* 101 Fed. 746, 41 C. C. A. 652; *Ratterman v. Ingalls,* 48 Ohio St. 468, 28 N. E. 168; *Ohio Farmers' Ins. Co. v. Hard,* 59 Ohio St. 248, 52 N. E. 635; *Putnam v. Osgood,* 51 N. H. 192; *Hatcher v. Dunn,* 102 Iowa, 411, 71 N. W. 343, 36 L. R. A. 689.

For the appellant *Chicago, Milwaukee & St. Paul Railway Company* there was a brief by *C. H. Van Alstine,* attorney, and *Burton Hanson,* of counsel, and oral argument by *Mr. Van Alstine.* They argued, among other things: (1) Both because secs. 1211–1214 are tax laws and because they impose forfeitures—$10,000 and the life of the corporation—they must be construed strictly, and if any proposition asserted under them is doubtful such doubt should be resolved in appellant's favor. *State ex rel. Abbot v. McFetridge,* 64 Wis. 130, 140; Potter's Dwarris, Stat. 256; *Rietz v. Foeste,* 30 Wis. 693; *Crumbly v. Bardon,* 70 Wis. 385; *People ex rel. Mut. T. Co. v. Miller,* 177 N. Y. 51, 57; *U. S. v. Wiltberger,* 5 Wheat. 76, 95; *Bolles v. Outing Co.* 175 U. S. 262. (2) The proper construction due sec. 1214 is that when the proper officers of the state receive and approve the statement of gross earnings, and a license is issued to the railway company, the forfeitures prescribed by that section are not incurred unless the railway company neglects to pay the fee which the approved report and the license itself call for. The railroad commissioner is the sole tribunal under the statutes to determine the correctness of a railroad's

report of gross earnings precedent to the licensing of such railroad to operate its lines within the state during the calendar year, and the approval by that officer of the railroad's report, followed by the issuance of the license thereon and the timely payment of the fee named therein, is a complete protection against the forfeitures prescribed in sec. 1214. *State ex rel. Coffey v. Chittenden,* 112 Wis. 569; *State ex rel. Cook v. Houser,* 122 Wis. 534; *State ex rel. Martin v. Doyle,* 38 Wis. 92; *U. S. v. Ju Toy,* 198 U. S. 253. It is not essential to the finality or conclusiveness of the decisions of special tribunals that the statute creating them should so declare in order to have that effect. *State ex rel. Cook v. Houser,* 122 Wis. 534, 570; *U. S. v. Doherty,* 27 Fed. 730, 732; *U. S. v. Arredondo,* 6 Pet. 691, 729; *U. S. v. Cal. & Oreg. L. Co.* 148 U. S. 31, 43; *Smelting Co. v. Kemp,* 104 U. S. 636, 645; *Baldwin v. Stark,* 107 U. S. 463, 465; *Steel v. Smelting Co.* 106 U. S. 447; *Shepley v. Cowan,* 91 U. S. 330; *Moore v. Robbins,* 96 U. S. 530; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421, 434, 435; *Wright v. Roseberry,* 121 U. S. 488; *Lee v. Johnson,* 116 U. S. 48, 51. The proposition that a railway company forfeits its corporate life and $10,000 by making a return of gross earnings which its officers, under advice of counsel, believed to be true, but is afterwards found to be untrue because of the mistake of counsel, is monstrous. Such is not the rule in this court. *Johnson v. Huber,* 117 Wis. 58; *Schumacher v. Falter,* 113 Wis. 563; *Cohn v. Neeves,* 40 Wis. 393. One who acts honestly under the advice of counsel acts in good faith. *Schumacher v. Falter,* 113 Wis. 563, 567; *U. S. v. Homestake M. Co.* 54 C. C. A. 303; *Myer v. Hart,* 40 Mich. 517, 524.

(3) Secs. 1211–1214 apply to earnings derived from domestic commerce only: construed otherwise, they violate the commerce clause of the federal constitution. Several states have adopted the system of taxing railways and other carriers engaged in both state and interstate commerce by requiring

the payment of a per centum of their earnings derived from such commerce, and the federal supreme court in several decisions has sustained this method of taxation; but in each one of these cases the payment of the per centum of such earnings was not made a condition precedent to the right to carry on the business, but its enforcement left to the ordinary means devised for the collection of taxes. *Postal Tel. C. Co. v. Adams,* 155 U. S. 688, 695, 696; *Allen v. Pullman's P. C. Co.* 191 U. S. 171, and cases there cited; *Osborne v. Florida,* 164 U. S. 650, 655; *N. Y., L. E. & W. R. Co. v. Pennsylvania,* 158 U. S. 431, 438; *Western U. Tel. Co. v. Massachusetts,* 125 U. S. 530, 554; *Maine v. Grand Trunk R. Co.* 142 U. S. 217; *McHenry v. Alford,* 168 U. S.. 651; *Wis. & M. R. Co. v. Powers,* 191 U. S. 379. That court has repeatedly decided that a state law is unconstitutional and void which requires a party to take out a license for carrying on interstate business, no matter how specious the pretext may be for imposing it. *Pickard v. Pullman S. C. Co.* 117 U..S. 34; *Robbins v. Shelby Co. Tax. Dist.* 120 U. S. 489; *Leloup v. Port of Mobile,* 127 U. S. 640; *Asher v. Texas,* 128 U. S. 129; *Stoutenburgh v. Hennick,* 129 U. S. 141; *McCall v. California,* 136 U. S. 104; *Norfolk & W. R. Co. v. Pennsylvania,* 136 U. S. 114; *Crutcher v. Kentucky,* 141 U. S. 47; *Postal Tel. C. Co. v. Adams,* 155 U. S. 688; *N. Y., L. E. & W. R. Co. v. Pennsylvania,* 158 U. S. 431; *Osborne v. Florida,* 164 U. S. 650; *Allen v. Pullman's P. C. Co.* 191 U. S. 171.

The *Attorney General,* attorney for the State, and *H. W. Chynoweth,* of counsel, for the respondent, argued, among other things, that the object of the statute in question was to raise revenues for the support of the government and to insure the prompt payment thereof into the state treasury. The penalty was prescribed to enforce the payment of the entire amount which the statute named. This intent is so plain that there is no room for construction in the sense in which the

term is used by counsel for appellants.    Proof of failure to
comply with the statute is conclusive, and to evade liability
therefor it is necessary to abrogate the statute.    The doctrine
that a penal statute should be strictly construed against the
state has its limitations.    The obvious intent of the legisla-
ture is not to be defeated.    *State v. Shove,* 96 Wis. 1, 9;
*Manilowoc Co. v. Truman,* 91 Wis. 1; *Nelson v. State,* 111
Wis. 394, 398; 13 Am. & Eng. Ency. of Law (2d ed.) 57;
*In re Coy,* 31 Fed. 794, 800; *State ex rel. Barton v. Kansas
City, Ft. S. & G. R. Co.* 32 Fed. 722; *Ellis v. Whitlock,* 10
Mo. 781; *Fairbanks v. Antrim,* 2 N. H. 105.    The statute
required, first, a true statement of the gross earnings; second,
the payment of four per cent. of its gross earnings.    There
is nothing in either the words or the spirit of the statute
which diminishes the amount to be paid on account of an in-
accurate or untrue report, or that indicates a legislative in-
tent to permit the report to stand for the fact.    On the con-
trary, the terms used very carefully exclude such an inter-
pretation, and fix the amount to be paid without reference to
any statement thereof made by the company itself or by any
other person whomsoever.    It would require the most explicit
and positive expression on the part of the legislature to make
conclusive on the courts a statement of this character.    It
would appear from the language here used that an untrue
statement made by a railroad company of its gross earnings
was not intended to be conclusive.    *San Francisco & N. P.
R. Co. v. State Board,* 60 Cal. 12; *Chicago, B. & Q. R. Co.
v. Paddock,* 75 Ill. 616; *St. Louis, V. & T. H. R. Co. v.
Surrell,* 88 Ill. 535; *Lake Shore & M. S. R. Co. v. People,*
46 Mich. 193; *Ill. & St. L. R. & C. Co. v. Stookey,* 122 Ill.
358; *Comm. v. Fall Brook R. Co.* 188 Pa. St. 199.    It is
not necessary that the omission or neglect be wilful or fraud-
ulent.    *State v. Hartfiel,* 24 Wis. 60; 3 Greenl. Ev. § 21;
*Barnes v. State,* 19 Conn. 398; *Comm. v. Mash,* 7 Met. 472;
*Comm. v. Boynton,* 2 Allen, 160; *Comm. v. Farren,* 9 Allen,

489; *Comm. v. Waite,* 11 Allen, 264; *Comm. v. Raymond,* 97 Mass. 567; *Comm. v. Elwell,* 2 Met. 190; *Mackay v. San Francisco,* 113 Cal. 392, 45 Pac. 696; *State v. Alta S. M. Co.* 24 Nev. 230, 51 Pac. 982; *State v. Carson City Sav. Bank,* 17 Nev. 146, 30 Pac. 703; *The Brig Ann,* 1 Gall. 62. Advice of counsel is available only in cases where all the facts have been fully and fairly stated and the advice given on such statement. There is a significant absence of any statement in the record to the effect that counsel either were given or understood what the facts were. This omission is fatal to appellants' case, so far as it is predicated upon advice of counsel. *Messman v. Ihlenfeldt,* 89 Wis. 585; *Sherburne v. Rodman,* 51 Wis. 474; *Sutton v. McConnell,* 46 Wis. 269; *Plath v. Braunsdorff,* 40 Wis. 107. It cannot be contended that the officers of the appellants who made the report were ignorant of the facts. They are conclusively presumed to know what the facts are. *U. S. v. Allis,* 73 Fed. 165, affirmed *Allis v. U. S.* 155 U. S. 117; *Finn v. Brown,* 142 U. S. 56; *Hubbard v. Ware,* 79 Iowa, 678; *Tate v. Bates,* 118 N. C. 287. The state is not estopped by the approval of the railroad commissioner. *Travelers' Ins. Co. v. Fricke,* 94 Wis. 258, 99 Wis. 367; *State ex rel. Fidelity & C. Co. v. Fricke,* 102 Wis. 107, 114; *Sturges v. Carter,* 5 Sup. Ct. 1014; *State ex rel. Davis & S. L. Co. v. Pors,* 107 Wis. 420, 425; *Lake Shore & M. S. R. Co. v. People,* 46 Mich. 193, 9 N. W. 249; *Comm. v. Fall Brook R. Co.* 188 Pa. St. 199; *Reynolds v. Bowen,* 138 Ind. 434; *U. S. v. Bank,* 15 Pet. 377, 401; *Harmon v. U. S.* 43 Fed. 560, affirmed *U. S. v. Harmon,* 147 U. S. 268; *Wis. Cent. R. Co. v. U. S.* 164 U. S. 190; *Hunter v. U. S.* 5 Pet. 173; *Steele v. U. S.* 113 U. S. 128; *U. S. v. Burchard,* 125 U. S. 176; *U. S. v. Stahl,* 151 U. S. 366; *Mullan v. U. S.* 118 U. S. 271; *Wis. Cent. R. Co. v. Forsythe,* 159 U. S. 46; *Southern C. & F. Co. v. State,* 133 Ala. 624; *State v. Raymond,* 12 Mont. 226; *Munsell v. Temple,* 8 Ill. 93; *State ex rel. Lott v. Brewer,* 64

Ala. 287; *U. S. v. Utz,* 80 Fed. 848; *Gordon v. U. S.* 1 Ct. of Cl. 1; *Board of Comm'rs v. State,* 103 Ind. 497; *Board of Comm'rs v. Heaston,* 144 Ind. 583; *Comm'rs v. Keller,* 6 Kan. 510. The terms of the statute embrace interstate as well as state commerce. The determination of this court as to the proper construction of the statute is conclusive upon the courts of the nation. *Osborne v. Florida,* 17 Sup. Ct. 214; *Noble v. Mitchell,* 164 U. S. 367, 372, and cases there cited; *Leffingwell v. Warren,* 2 Black, 599; *People v. Weaver,* 100 U. S. 539. As to the words of the statute themselves, they are not open to construction. They are not susceptible of a double or doubtful meaning or interpretation. But as to their applicability to the different kinds of commerce they are, as used, doubtful, ambiguous, and open to construction. They have been construed by the officers of the state, by the appellants, and by all other similar corporations called upon to comply with the statute or intrusted with any power or duty with reference to it for each year since 1876. This practical construction was recognized by this court in *State v. Pullman's P. C. Co.* 64 Wis. 89, 99; it stands approved by the court itself, and is therefore binding.. *Scanlan v. Childs,* 33 Wis. 663; *State ex rel. Hudd v. Timme,* 54 Wis. 318; *Dean v. Borchsenius,* 30 Wis. 236; *Eau Claire Nat. Bank v. Benson,* 106 Wis. 624; *State ex rel. Heiden v. Ryan,* 99 Wis. 123; *Michels v. State,* 115 Wis. 43; *State ex rel. Lamb v. Cunningham,* 83 Wis. 90; Sutherland, Stat. Constr. § 311, and cases cited in note 2, § 307, and numerous cases cited in note 3. Thus construed to embrace interstate commerce the statute does not contravene the federal constitution. It does not impose a specific tax upon the gross earnings of the companies. It does not prohibit the transaction of interstate commerce by any railroad company within or without the limits of the state. It simply imposes a tax upon the physical property of companies situated within the state and their franchises granted by or used in the state; and it

measures this tax by a resort to the gross earnings. If there be power in the legislature of the state to tax the property of a corporation which has a situs in the state, and to tax its franchise granted by the legislature of, or exercised in, the state, then this law is good. The mere fact that the sum to be paid may have been called by the legislature a license fee is wholly immaterial: its name does not make it anything different from what it actually is. It has always been considered a tax upon the property of the company, measured by the gross earnings. *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37. There is nothing in the words of the statute which warrants the statement that the legislature imposed the tax as a condition upon the companies to do even a local or state business, much less to do an interstate business. The property of corporations and persons engaged in the business of interstate commerce is subject to taxation within the state where it is located, to the same extent and under similar circumstances as other property. *Delaware Railroad Tax,* 18 Wall. 206; *State Tax on Railway Gross Receipts,* 15 Wall. 284; *Atlantic & P. Tel. Co. v. Philadelphia,* 190 U. S. 160; *Maine v. Grand Trunk R. Co.* 142 U. S. 217. This last case has been approved in the following federal cases: *Hanley v. Kansas City S. R. Co.* 187 U. S. 617, 621; *Wis. & Mich. R. Co. v. Powers,* 191 U. S. 379, 383; *Postal Tel. C. Co. v. Adams,* 155 U. S. 688, 699; *Ashland v. Ryan,* 153 U. S. 436, 446; *Hooper v. California,* 155 U. S. 648, 652; *Pittsburgh, C., C. & St. L. R. Co. v. Backus,* 154 U. S. 421, 431; *New York, L. E. & W. R. Co. v. Pennsylvania,* 158 U. S. 431, 440; *McHenry v. Alford,* 168 U. S. 651, 670; *Western U. Tel. Co. v. Taggart,* 163 U. S. 1, 21; *Western U. Tel. Co. v. Henderson,* 68 Fed. 588, 600. And also in the following state cases: *Cumberland & Pa. R. Co. v. State,* 92 Md. 668, 688; *Comm'r of Railroads v. Wabash R. Co.* 126 Mich. 113, 115; *People ex rel. Pennsylvania R. Co. v. Wemple,* 138 N. Y. 1, 13; *Union R. T. Co. v. Lynch,* 18

Utah, 378, 394, 55 Pac. 643; *Lumberville D. B. Co. v. State Board,* 55 N. J. Law, 529, 535. And see 27 Am. & Eng. Ency. of Law (2d ed.) 932; 1 Cooley, Taxation (3d ed.) 160, 162.

The following opinion was filed June 21, 1906:

MARSHALL, J. The question is sharply presented in these cases as to whether the absolute forfeiture of $10,000 under sec. 1214, Stats. 1898, applies to a mere mistake of law or fact or both, in respect to the scope of the term "gross earnings," or any other mere mistake on the part of any railway company, in respect to disclosing, as the law contemplates, the full amount of such earnings, such mistake not attributable to bad faith or inexcusable negligence, from the standpoint of business conduct generally,—and consequent failure to pay the amount due the state on account of such earnings, without intentional wrong. The learned circuit court decided in the affirmative.

We have not been able to reach a satisfactory conclusion in these cases without taking a broader view of the subject involved than was presented in the briefs of counsel or argued orally. Such broader view seems necessarily to extend to and include matters which may or will be involved in probable, prospective independent litigation. Nevertheless, such matters have seemed to be so closely connected with the present controversy, as regards the meaning of the legislative enactment involved, as to really form a part of the subject matter in hand, and, in justice to the parties, to require consideration thereof.

Further to illustrate the prime necessity, in the interest of justice, for the wide range our considerations here must necessarily take and the propriety thereof the following may be said:

In the narrow view of the subject in hand only a partial construction of the various features of the legislation for tax-

ing railway property by the indirect method, a view that would omit considering whether the state may pursue the defendants, efficiently, as to the amounts which they confessedly ought to have paid but did not pay, one result might be the only one that could be reached. In the broader view, necessarily including such capacity to pursue, an opposite conclusion might be the only one that could be reasonably reached. The relations between the state and railroad companies under the license taxing law, the precise nature of the obligations of the latter to the former in respect to the taxes, so called, the question of whether those elements differ from those in respect to an ordinary tax, and, if so, to what extent, and with what result, in one view of the matter might or would, as we shall see, incline the scales of justice one way or the other according as they might be determined.

Obviously, in deciding a question, the court ought to carefully guard against going outside of the particular matter in hand. All questions so far collateral as not necessarily to be included in such matters should be omitted in stating reasons for the final result. Especially when what is said, as here, may relate to questions liable to be vital in controversies which are of themselves appropriate subjects of litigation, and apparently liable in due course to reach the court for consideration, the importance of guarding against expressing opinions in respect thereto calls for the highest degree of care to avoid it. However, like all good rules, that has its exceptions. Necessity creates exceptions to many rules, extending their otherwise quite arbitrary boundaries. Here, only in the light of the true nature of the obligations of railroad companies to the state under the scheme for raising revenue in question, and all remedies of the state which the legislature may reasonably be said to have had in contemplation in adopting such scheme: only in the light of the legislative plan as a whole, can clear warrant be discovered for reading out of the law a condition of the penal liability under sec. 1214, not there

found expressly stated. The language of the act is about as plain in its literal sense, as will be seen, as words expressing an idea could well be. In such sense default of a party, whether wilful or innocent, excusable or inexcusable, from a moral standpoint, lays such party liable, absolutely, for the full penalty mentioned in the statute, and liable in the discretion of the court to further punishment. That seems exceedingly harsh, but if the legislature intended to be that harsh and did not exceed constitutional limitations in that regard, the court has no right to invade its domain by judicially, so to speak, amending the law.

We fully appreciate as indicated that a decision should not, without some good warrant therefor, be broadened out beyond its necessary scope. When the question at issue is important, and is closely connected with somewhat collateral matters, which might, by themselves, constitute an independent matter for decision, and a conclusion in respect thereto would throw much, though not necessary, light upon the right of the particular controversy, and either by its aid a just conclusion would be attainable, when otherwise the result might be different, or the same result might be reached without such solution, though not so satisfactorily *in præsenti*, or with so much certainty of such result being permanent by the rule of *stare decisis*, as through the aid of such solution, the broader view is not only permissible but is often advisable, except in case of known independent pending or impending litigation liable to be affected incidentally thereby. However, when the right of the controversy in hand cannot in any way be vindicated without judicial treatment covering a broad field, including some question or questions liable to be vital to other pending or prospective litigation, justice should not be denied in the former, nor even be jeopardized, either because not attainable at all, or clearly and decisively attainable, without considering and deciding such other question or questions. That does not lead to any unnecessary prejudicial anticipa-

tion of .matters which may or probably will come up later. It merely involves an unavoidable solution, for the purposes of one case, of questions upon which another may or probably. will turn.

Fully convinced of the soundness of the views stated, and fully appreciating that the broad scope we shall give to the matter in hand may involve an expression of opinion upon matters vital to controversies yet probable to come before us, but fully believing that it is unavoidable under the circumstances, we proceed, convinced that what has been said sufficiently shows that, so far as our conclusion may incidentally indicate a leaning as to such other controversies, the happening will be clearly seen to be what it in fact is, an occurrence *ex necessitate rei.*

Eliminating from the law those portions not necessary to its meaning, as to the subject here, and indicating by a parenthesis the amendment of 1899, the entire legislative scheme appears thus:

Sec. 1211. "Every railroad company . . . shall on or before the 10th day of February in each year make return to the state treasurer" in the manner required by him "a true statement of the gross earnings of" its road "for the preceding calendar year . . . verified by the oath of its secretary and treasurer."

Sec. 1212. "Each such railroad company . . . shall, on returning such statement, apply for a license *to operate the railroad mentioned in such statement,* and shall pay the license fee therefor provided in the next section; and thereupon (if such statement be approved by the railroad commissioner) shall receive from the state treasurer a *license* . . . *for the calendar year* commencing on the first day of January preceding, . . . unless sooner revoked."

Sec. 1213 specifies the fee as to each road, according to a stated classification, "one half of the license fee" to "be paid at the time the license issues, and one half on or before the 10th day of August in each year."

Sec. 1214. "If any such railroad company . . . shall neglect to obtain such license or pay the license fee therefor or

any part thereof" it "shall *absolutely forfeit* to the state the sum of ten thousand dollars, . . . and such neglect shall also be a cause of forfeiture of all the rights" granted under the laws of this state. The attorney general "shall collect by action the pecuniary forfeiture herein imposed and also proceed to have forfeiture," otherwise, "duly declared. Any such company . . . before the final judgment of forfeiture . . . may be permitted to make the return and pay the license fee herein provided for upon special application to the court . . . upon such terms as the court shall direct."

These actions, as counsel for appellants contend, are governed by sec. 1214, but, as before indicated, the meaning thereof must be determined by looking at all parts of the plan of which that forms one feature.

The idea is advanced that the words "obtain a license or pay the license fee therefor or any part thereof" refer to invoking favorable action by the administrative officers of the state having to do with the matter: the railroad commissioner, as to passing upon the report, and the treasurer, as to receiving the license fee and issuing the proper license, and that the result is conclusive in favor. of the licensee, as to the penal clauses. Counsel reach that conclusion by assuming that the law which first included the license feature (ch. 174, Laws of 1860) provided for a return, as now, payment of the required percentage on "gross earnings . . . to be ascertained *by such return,*" and the issuance of a certificate acknowledging such payment, that to be "evidence of the facts therein contained,"—made the return conclusive of the amount payable, and the license conclusive as to the fact of payment; and that such features, though discontinued by the Revision of 1878, were in effect restored by the change in 1899, requiring, as a condition precedent to the issuance of the license, approval of the report by the railroad commissioner. The assumption does not seem warranted.

The dominant feature of the law of 1860 is contained in sec. 1: the idea that every railroad shall be required to pay

to the state, as a condition of conducting its business, a stated proportion of its gross earnings. The rest of the act consists of mere administrative features. Such dominant feature was a substantial continuation of the controlling feature in the initial law on the subject (ch. 74, Laws of 1854) incorporated into sec. 183, ch. 18, R. S. 1858. It has been continued down to the present time, and is now contained in secs. 1212 and 1213, Stats. 1898. It still requires, without qualification, payment of a license fee each year *for the privilege "to operate the railroad"* for such year, except as displaced by ch. 315, Laws of 1903.

The license was not, by the act of 1860, made conclusive evidence of payment of the full amount required by law, nor, expressly, evidence at all of compliance therewith, but "evidence of the facts therein contained," referring obviously to the facts *required* to be contained therein: viz., making the return of gross earnings, application for a license thereon, and payment of the required percentage of such earnings, *"as ascertained by such return."* It would be a highly unreasonable construction of such provisions to hold that the legislature intended thereby that the state should take the return as absolutely correct, leaving no remedy for failure of the railroad company, through mistake or fraud, to pay the proper amount. It must have been contemplated that the payment, precedent to the issuance of the license, should be based on the statement of gross earnings made by the payee, and that the license should be evidence thereof, but not more than *prima facie* evidence of payment of the amount required by law.

True, in the Revision of 1878 the former feature, expressly making the certificate of payment evidence, and the express requirement for payment to be made upon gross earnings "as ascertained by such return," were omitted. But we do not find any evidence in the revisers' notes, or in their work as approved by the legislature, indicating a purpose to

change the existing law. It was not necessary to declare that the license should be "evidence of the facts therein contained," to make it so. It would be such without any such declaration, but not conclusive evidence in any event, unless made so expressly.

By the re-enactment of sec. 2 of the law of 1860 in sec. 1212 of the Revision of 1878, a railroad, on returning its statement, was required, as before, to apply thereon for a license and make the payment required by law, payment manifestly on gross earnings according to such statement. No investigation by the treasurer was required to be made nor contemplated precedent to such payment. The making of the return, payment of the required percentage of gross earnings as indicated therein, and issuance of the license are plainly treated as if they were intended to follow each other without interruption and as a matter of course. That feature did not preclude the treasurer from refusing to issue the license upon the return made, and thereby challenging its correctness, as was done in *State ex rel. C., M. & St. P. R. Co. v. McFetridge,* 56 Wis. 256, 14 N. W. 185; *State ex rel. Abbot v. McFetridge,* 64 Wis. 130, 24 N. W. 140; and *State ex rel. Bell v. Harshaw,* 76 Wis. 230, 45 N. W. 308. The same was probably true under the law of 1860, notwithstanding the provision requiring payment of the license fee upon gross earnings as "ascertained from such return." From the first, the legislative idea was to create an obligation to the state of each railroad company, in exchange for the privilege of operating its road, to pay the former a specified proportion of the latter's gross earnings, and to impose upon each such company the duty to make a correct showing of the whole, so as to enable the state, through its proper officers, to accurately determine its proportion. That duty was not performed under the act of 1860, nor the subsequent law on the subject, except by performance in fact as well as in form. Hence, in case of the latter, merely, the officer upon whom

the duty was imposed to issue the license, upon refusal, was not put in default so as to be open to coercion, successfully, by *mandamus*.

The feature of the law added in 1899, making approval of the railroad companies' return, as well as payment of the license fee, a condition precedent to the issuance of the license, is new. It plainly contemplated payment to the state of the specified proportion of gross earnings as ascertained by such return, the same as before, but a withholding of the license till approval of such return should be secured, unless that should occur before making the application. The scope of the commissioner's duties in the matter has an important bearing on the right of these controversies. If the law clothed him with *quasi*-judicial duties in respect to the subject, intending his approval to be in the nature of a judicial determination, as counsel for appellants contend, then, of course, until such determination in any case shall be avoided for jurisdictional error it will form a bar to any prosecution under the penal provisions of the statute. *State ex rel. Cook v. Houser,* 122 Wis. 534, 560, 561, 100 N. W. 964.

Applying the change wrought in 1899 to the subject with which it deals, ambiguity in the language is apparent at once. *"If such statement be approved by the commissioner."* Those words are very comprehensive in their literal sense. That goes so far as to suggest intention for the commissioner to act as a judicial arbitrator between the state and the applicant for a license, respecting whether the amount of gross earnings and the trackage reported by the latter: the two things necessary to determine the proper amount of such applicant's contribution, are correct, in many cases requiring a long, laborious, and searching investigation of the books of the railroad company. That indicates the words were used in a somewhat narrower sense than the full scope thereof, since, as seems plain, the duty of approval was not supposed to require any considerable time in performance. Notwith-

standing the change, the payment of one half the license fee at the time of issuing the license remained as before.

The amendment, as will be seen, treats the return, the application for the license, and the payment therefor as parts of one transaction. Evidently it was intended the applicant should obtain the requisite approval of its return in advance of presenting it to the treasurer. That is manifest from the fact that, notwithstanding the added feature, the time for making the return and applying for the license was not changed, and the applicant was still required to pay one half of the license fee *at the time of issuing the license.*

"And thereupon," says the amendment, "if such statement shall be approved" a license shall issue. "And thereupon" refers to the making of the return and the payment. It signifies immediately: at once. "If such statement be approved," in view of the context, signifies a condition *in præsenti,* harmonizing with "thereupon" as regards the making of the return, application for the license, and payment of the license fee. The subjunctive form was used with the mere conditional instead of the indicative form. The idea intended is this: upon payment of the license fee required by law according to a statement approved by the railroad commissioner, the license shall issue. Had the language of the amendment been, if such statement is approved, or if such statement shall be approved, suggesting a condition, or if such statement shall have been approved, suggesting a previous act of approving, the real legislative intention would appear more clearly. Hence, while the approval may be a subsequent occurrence, and the issuance of the license be delayed therefor, the legislative idea evidently was that the commissioner should have sufficient opportunity to perform his duty in that regard prior to the time for payment. .

An investigation of a year's business of all the railroad companies operating in this state would take the time of the railroad commissioner with a corps of expert assistants for

months. There can be no reasonable doubt about that. Such an investigation would be necessary, in any case, in order to determine the truth of the report presented by a company, independently of mere general information afforded by the company itself. The time which the commissioner could devote thereto before the date for paying the license fees would be too short, altogether, even for investigating the business of one road. The year to be covered by the report closes December 1st. In forty-two days thereafter, the report is required to be in the hands of the state treasurer, with the commissioner's approval thereon.

There is no more familiar rule for the construction of statutes than that a meaning should not be attributed to one which will render it absurd, if another which is reasonable can be discovered, expressed within the scope of the language used.

"Courts may ignore the literal sense of words even where there is no uncertainty of expression, in order to clear up obscurities and avoid absurd consequences, and carry out the idea of the lawmakers, if such idea . . . can be reasonably said to be covered by the language used." *State ex rel. Heiden v. Ryan,* 99 Wis. 123, 74 N. W. 544; *Rupiper v. Calloway,* 105 Wis. 4, 6, 80 N. W. 916.

The duty, impliedly imposed on the railroad commissioner, must be one possible for him to perform in order to render the law a sensible enactment. By turning to the statutory requirements as to information to be furnished the commissioner's office by railroad companies, the nature of that duty seems apparent. By sec. 1843, Stats. 1898, every railroad company is required, each year, to make a report to its stockholders of all its operations for the year ending the preceding 31st day of January, and to send a certified copy thereof to the railroad commissioner, on or before the 1st day of February. It will be noted that *ex industria* the legislature required such report to be in the hands of the railroad com-

missioner in time for use in verifying the statements of the railroad companies under sec. 1211. Such report is required to contain much information of value to the commissioner in performing his duties under sec. 1212.

Further, by sec. 1795 of the Statutes, every railroad company is required to make such reports to the railroad commissioner under oath as he shall require, and particularly to make such reports as may be necessary to enable him to make return to the state treasurer on or before the 10th day of February in each year, as to certain specified matters. Thus, again, it will be noticed that the information required to be furnished to the commissioner's office must be there before the time for him to perform his duty of approval of the statements. So, quite plainly, the legislature must have contemplated the existence in such office of the information requisite for the commissioner's use in verifying the correctness of the statements and performance of mere ministerial duties in respect to the matter. The idea is that, prior to February 10th in each year, the commissioner shall receive the statements purposed to be returned to the state treasurer, and to reasonably verify them so far as shown to be correct by the files of his office. So the law, at the time of the occurrences under consideration, did not require performance by either the state treasurer or the commissioner of any duty in respect to the statement of any railroad company, precedent to the issuance of the license to it under sec. 1212, except one of purely ministerial nature.

What has been said gives due consideration, it is thought, to all matters of importance relied upon by appellants as showing the purpose of the legislature up to 1878, and again commencing with the act of 1899, of making the license a full protection to the holder as to penalties for noncompliance with the law in respect to payment of the required proportion of gross earnings. We will now briefly refer to those features of the law necessary to be dealt with favorably

to respondent in order to support the judgment. We shall forego treating the matter historically to the full extent. We will content ourselves by briefly stating the condition of things which confronted the revisers in 1878, and the way they met it. That will place before us sharply the origin of some of the difficulties to be solved under the law as we now find it. The law at the time of the occurrences under consideration was the same, in all essential particulars, as it was left by such revision, the act of 1899 not working any material change, as we have indicated.

The situation for the revisers to work into a harmonious system was created by the following:

(1) Ch. 74, Laws of 1854, contained three features: (a) An obligation of every railroad company to file with the state treasurer by January 10th of every year a verified statement of its gross earnings in this state for the previous calendar year; (b) an obligation of each such company by such time to pay into the state treasury, as a tax, one per centum of such earnings, that to be in full of all tax liabilities on account of its property; (c) liability to "forfeit to the treasurer of the state for the use of the state, the sum of $10,000 for each case of neglect, to be recovered in the name of the state treasurer by the action of debt." That law was incorporated into the Revised Statutes of 1858 at secs. 182, 183, and 184, ch. 18, the penal clause being so phrased as to apply only to violations of the provisions of that chapter.

(2) Ch. 140, Laws of 1859, changed the date in the first feature to February 10th, and that in the second to April 1st.

(3) Ch. 174, Laws of 1860, revised the second feature: the one contained in sec. 183 aforesaid, without changing it as to the amount of the exaction, making the date of payment February 10th, adding the license feature and the idea of payment upon gross earnings as ascertained by the statement, substituting for the express idea, formerly, of payment of a part of the earnings as a tax, the idea of payment

thereof as compensation *for the "privilege of operating the road:"* such matters being incorporated into two sections; and adding in a separate section the features as to failure to comply with the provisions of that act, the duty of the attorney general to prosecute therefor, and the right of the court in the action, in its discretion, to grant relief from the default on terms. It should be noted that by mistake, it seems, the legislature failed to expressly repeal sec. 183, which was fully revised as stated, though it was manifestly repealed by implication. There was a repeal expressed of sec. 133, ch. 18, of the Revised Statutes, which was doubtless intended for sec. 183. It should be further noted that the amendatory act of 1860 did not contain any provision as to a return. That was left to be governed by the existing law.

(4) Ch. 22, Laws of 1862, changed the proportion of gross earnings from one per cent. to three per cent., and permitted one half to be paid upon the issuance of the license and one half August 20th thereafter, failure to pay the second half to work a forfeiture of the license and incur the punishment provided in the act of 1860.

(5) Ch. 315, Laws of 1874, and chs. 97, 113, Laws of 1876, changed the license fees and classified the roads.

Thus it will be seen, the penal provision, particularly involved here, originated in 1854, but after 1860, until the new revision, it did not apply to any default except failure to make the report, while punishment by forfeiture of rights and franchises applied to failure to make the requisite payment and to obtain the license.

The revisers proceeded thus: The first feature of the law of 1854, as incorporated in sec. 182 of the Revision of 1858, as modified by the law of 1859, without change was made sec. 1211.

The second feature of the original law, as incorporated into sec. 183 of the Revision of 1858 and changed by the

law of 1860,—eliminating the express requirement for computing the percentage of gross earnings on the whole thereof as "ascertained from such return," adding the idea of termination of the license by revocation, found only in the act of 1862, in connection with failure to pay the second half of the license fee: eliminating the feature as to the proportion of gross earnings to be paid, and referring to the next section for that subject, and adding the idea that the license should be revocable for cause,—was made sec. 1212.

The feature last said to have been eliminated with the change as to the proportion of earnings to be paid and classification of roads made by acts of 1874 and 1876, and the feature of the law of 1862 as to the payment of the license fee in two instalments, was made sec. 1213.

The third feature of the act of 1854, as incorporated into sec. 184 of the Revision of 1858: the one particularly involved here, and not applicable, as we have seen, other than to failure to make the return of gross earnings, after the law of 1860, and the penal feature of the later law, which, as we have seen, was therein made applicable to failure to pay the required percentage or procure the license, were combined as sec. 1214, and made applicable to any default as to any of the requirements under the preceding sections, the word "absolutely" being interpolated before the word "forfeit" as regards the $10,000 feature, so that whereas before the wording of the law was "shall forfeit," etc., it was made to read "shall absolutely forfeit," etc.

Thus we have this situation, in express language, as to every railroad company: *first,* a requirement to make an annual report of gross earnings; *second,* a requirement to obtain an annual privilege to operate the road, the same to be evidenced by a license issued by the state treasurer; *third,* an obligation to pay to the state for such privilege a specified proportion of gross earnings, one half at the time of the issuance of the license and one half August 10th thereafter;

*fourth,* absolute liability for the payment of $10,000 for any default in respect to any of such matters, and a conditional forfeiture of franchises. No mention is made in the law of the subject of taxation as such. That is an exceedingly important feature of this case. A penal statute in aid of the taxing power only or as a police regulation might not be open to the liberal construction of one in aid of the enforcement of taxes having the element of contract obligation.

It is not important here that the exactions are taxes in the broad sense of the term, which includes all burdens imposed, resulting, in the discharge, in contributions to the public funds for the public use. The term "tax" has come to be applied to all sorts of exactions which swell the public funds, stopping short only of fines imposed as punishment for criminal occurrences. Laws requiring payment to the state of compensation for the enjoyment of a privilege, such as that of a foreign corporation to do business within the state, or requiring contribution to the public treasury as mere police regulation, such as license fees of hawkers or peddlers and saloon license fees, are commonly called taxes. In a broad sense most of them are referable to the taxing power though probably no one would regard them as taxes in a constitutional sense: that is as taxes on property falling under sec. 1, art. VIII.

The payment by a railroad of a percentage of its gross earnings as compensation for the privilege of operating its road, or exemption of its property from the burdens of ordinary taxation, is generally spoken of as a tax, and properly so in the broad general sense, since the sum paid goes into the public funds to meet public expenses, and the method by which it is secured is an indirect way of reaching the railroad property for the purpose of obtaining public revenue therefrom. However, such method involves the contractual element, while taxation in the ordinary sense: taxation on property, which is regulated by sec. 1, art. VIII, of the con-

stitution, does not involve such element at all. Such taxes do not constitute debts in the ordinary sense. Ordinary remedies for the collection of debts have no application to them unless the statute so provides. The text-writers uniformly say upon authority that an ordinary tax on property does not involve a contract, express or implied. Cooley, Taxation (3d ed.) 17. When we keep in mind the distinction between a privilege tax involving the element of contract, and a direct tax on property, which does not involve such element, we can easily see that though the former are commonly and properly denominated taxes they are not referable to the taxing power in the constitutional sense. This we shall see more fully later.

The act of 1854, as we have shown, in terms required the payment by each railroad company of a percentage upon its gross earnings, the same to *"take the place and be in full of all taxes upon its property."* When it was challenged first in *Milwaukee & M. R. Co. v. Waukesha Co.,* decided in 1855 and not officially reported in due course (9 Wis. 431), its validity turned principally on whether it was an exercise of the taxing power in the strict sense of the term: such power as expressly recognized and limited in the constitution. All members of the court participating in the decision seem to have agreed in the negative, and such was the view of Judge HUBBELL, who decided the case at the circuit.

True, we have only a fragmentary history of that case preserved in the books, but it is about as definite in connection with the emphatic approval thereof in *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 8 N. W. 833, as an authoritative statement of the law, as if a formal opinion had been filed showing not only the final result, but the process of reasoning by which it was reached. We will give that history, in brief, with the various allusions to the matter by those who had early to do therewith, demonstrating, it is thought, that the decision was not grounded on the idea that the law of

1854 provided for a tax on property in the ordinary sense, but was based on the principle of privilege taxes.

Judge HUBBELL's view is most clearly shown by this quotation from his opinion:

"I see no reason why . . . the law in question, which operates as a partial exemption from general taxation, may not be valid. Regarding the annual payment to the state as a tax, as the defendants claim, why might not the legislature grant exemption in all other respects? The law, certainly, is not void, because it is not worse, and does not confer greater privileges . . . to wit, total exemption. But I regard the payment to the state, not as a tax, but as a bonus or compensation for the exemption granted. . . . Had the legislature exempted their property from ordinary taxation, in consideration of their doing some service to the state—such as carrying troops or public stores free of charge,—no one would call the service a tax, or question the validity of the exemption. *It would be a privilege granted for a service rendered.*"

Here at the very outset is the idea of revenue with incidental contract relations as distinguished from revenue derived from ordinary taxation. The meaning is unmistakable, viz.: revenue not from taxes on property in a constitutional sense, but in exchange for a privilege granted.

That idea which, it seems, formed the basis for the first judicial declaration was never departed from. When the matter was presented to this court upon review, the members thereof consisted of Chief Justice WHITON and Justices SMITH and COLE. The first and last were members of the convention that framed the state constitution and must be presumed to have been well equipped, especially the chief justice, who took a leading part in such convention, to meet successfully the responsibility of reaching a correct conclusion as to the nature of that part subsequently so judicially considered. No expression made by the chief justice in the case has been preserved, but it must be taken as a verity that he fully concurred in the decision as framed by Justice

SMITH, which, though mislaid for a time, was recovered and since 1860, at least, has been part of the official reports. We have the same presumption as to Justice COLE reinforced by his expressions in subsequent cases. In *Knowlton v. Rock Co.* 9 Wis. 410, in his opinion dissenting from the practical overruling, as he thought, of the decision in the former case, he said, speaking thereof:

"This court, after as full an examination and as careful consideration as has been given to any case which I have participated in deciding, sustained the law; the validity of which had been called in question. Though no opinion has been prepared, *yet the points decided were written out by one of the members of the court, and, as he informs me, placed on file with the papers in the case.*" [Note the declaration that the points unanimously agreed upon were those stated in the written memorandum.] "It appears that the paper containing these points has been misplaced, or cannot now be found. Still, I supposed the ground of that decision was well understood throughout the state. This court did not decide, as has been intimated, that the law of 1854 did not impose a tax in the just and proper sense of that term, but was a payment made to the state . . . in the nature of a bonus or compensation for the exemption granted. . . . The legislature might prescribe that all the railroad property in the state should pay one per centum of the gross earnings of their respective roads, in lieu of all taxes, as was done by the act of 1854, and yet this law would be valid."

It will be seen that Justice COLE was then speaking wholly from memory. His declaration that it was not held in the former case that the law of 1854 "did not impose a tax in the just and proper sense" would be misleading if not taken in connection with the memorandum decision which he testified was correct. His affirmation in that regard makes such memorandum in effect his deliberate declaration as to what was in fact formerly decided, re-affirming it after a lapse of some four years. That he did not have a clear remembrance of the precise nature of the decision is evident from the fact

that he disagreed in respect thereto with his then associates whose idea of it was confirmed by the memorandum when found. Such associates must have been very firmly convinced of the correctness of their view or else they would not have ventured to disagree with Justice COLE as to a matter resting wholly in memory in which he participated but they did not. However, their view became that of the court, as to what was really the dominant feature in the first case, and so it has stood till this day, as will more fully appear in *Chicago & N. W. R. Co. v. State, post,* p. 553, 108 N. W. 557.

In Justice COLE's opinion he used the term "in lieu of all other taxes," instead of the term "in lieu of taxes," used by Judge HUBBELL, suggesting somewhat that the court in the former case treated the exaction as a tax in a constitutional sense, evidently through failure of memory. The difficulty evidently grew out of the fact that two points were presented and decided in the former case, viz.: (1) Assuming that the law contemplates a tax under sec. 1, art. VIII, of the constitution, does the law violate the constitutional requirement of uniformity? (2) Does the law contemplate a tax referable to sec. 1, art. VIII, of the constitution? The negative of the first proposition would support the law. The negative of both would support it. The affirmative of the first and the negative of the second would support it. The second proposition was given primary place by counsel on both sides as the briefs of Mr. Ryan and Mr. Finch clearly show. The brief of Mr. Finch, under a principal and four sub-heads, argued that the law does not impose a tax, continue, or renew a tax, and a license exaction for a privilege is "not a tax within the meaning of the constitution." The several aspects of the case were presented by counsel. They were distinctly covered by the decision, as the record shows. The first aspect is the one that seems to have most lastingly impressed Justice COLE's mind, as is indicated from his language quoted and is also testified to by

Justice PAINE, *State ex rel. Att'y Gen. v. Winnebago L. &
F. R. P. R. Co.* 11 Wis. 35, 38.

All uncertainty was fully cleared up later. The proof that
those associated with Justice COLE in *Knowlton v. Rock Co.*
9 Wis. 410, supposed and acted upon the theory that the
former decision went mainly upon the ground that the law
of 1854 did not contemplate an ordinary tax such as is re-
ferred to in the constitution, leaves nothing to be desired.
Chief Justice DIXON who wrote the opinion said of the for-
mer decision:

"However, from the best information we have been able
to obtain, we are relieved from any embarrassment growing
out of the doctrines which it was claimed by counsel were
established by it; as we learn that it was determined by the
court *that no question of the exercise of the taxing power
was involved in it.*"

Justice PAINE, who was the other associate of Justice COLE
in the *Knowlton Case,* later in *State ex rel. Att'y Gen. v.
W. L. & F. R. P. R. Co., supra,* said on the same subject:

"According to the best information we had of it, the court
held that the imposition upon the railroad *was not a tax
within the meaning of the constitution.*"

Before this later case Justice COLE's memory as to the first
case seems to have been somewhat refreshed, as note his lan-
guage in the second dissenting opinion:

The case presents for consideration "the validity of those
provisions of *our revenue law* requiring the several railroad
. . . companies to pay annually into the state treasury one
per centum of the gross earnings of their respective roads
which are declared shall *be in lieu of all taxes that might
otherwise have been imposed upon that class or description
of property.* . . . If the legislature can exempt railroads
from taxation on the ground of public policy or convenience,
can it not say they shall pay one per centum of the gross
earnings of their respective roads into the state treasury in
lieu of all taxes? . . . I have no doubt but it is entirely com-
petent for the legislature to make these various exemptions."

Thus he concurred, quite distinctly, in effect, with all others whose testimony we have on the subject, that the original judicial idea of the law of 1854 was that it did not provide for taxation of property in a constitutional sense, but did provide for exemption of property therefrom and compensation to the state for the privilege. It obviously, it seems, evinces a confusion of ideas when it is said that compensation in lieu of taxation, in a constitutional sense, is itself taxation in such sense.

We will now look particularly at the written evidence of the decision in *Milwaukee & M. R. Co. v. Waukesha Co.* 9 Wis. 431; the memorandum under the hand of Justice SMITH, recovered after *Knowlton v. Rock Co.* was decided, and said by Justice COLE, as we have seen, to be a correct statement of the points previously decided. That left no ground, it would seem, to doubt that the proposition of primary importance in the case was the first one we have mentioned, and that it was decided in the negative. This is the language of the memorandum:

"The court do not think the law of 1854 does impose a tax within the meaning of the constitutional provisions, and therefore the law is valid so far at least as the government is concerned."

After many vicissitudes that decision was affirmed in *Kneeland v. Milwaukee,* 15 Wis. 454, decided in 1862. The conclusion there reached effaced from our records everything that had occurred casting discredit upon the first decision, and intrenched and dignified it as voicing the true nature of the law of 1854 and the dominant reason why it was not condemned as unconstitutional, namely: because it did not deal with the subject of taxation in a constitutional sense at all, but dealt with the power to exempt from taxation and to exact an equivalent therefor. Speaking of the effect of the latter decision, in *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 8 N. W. 833, the present chief justice said, sub-

stantially: It put upon all judicial decisions and expressions with reference to the act of 1854 subsequent to the decision in *Milwaukee & M. R. Co. v. Waukesha Co.* in 1855, inconsistent therewith, the impress of "mere *dicta.*" The chief justice further well said that considering the ability of counsel who presented the case and the justices who considered and decided it, "it would seem almost impossible that there should be any mistake in the conclusion reached." The conclusion "necessarily was adverse to every point" raised by the demurrer. It was that the law was constitutional because it was legitimate to exempt a class of property from taxation and to do it upon condition of the owners paying a stated compensation "to the treasurer of the state for the use of the state" in lieu thereof. Here, in 1881, we find the most emphatic declaration that the basis of the former decision was that the early law did not deal with the imposition of taxes such as are mentioned in the constitution, but with exemptions therefrom in consideration of the rendition of an equivalent for the privilege. We should say in passing, in order not to have its importance overlooked, that the idea of compensation for the privilege of operating the road was not then thought of, because it was not, as we shall see, a feature of the old law, but was added in response to a judicial suggestion in the law of 1860.

The question has been, even, suggested at this late day as to whether the memorandum to which we have referred is the one mentioned by Justice COLE as containing the statement of "points decided, written out by one of the members of the court." That idea springs up, so to speak, the product of imagination, as it were, when stimulated by interest, to avoid the letter or spirit of the early decisions, as persistently as the ghost in the play, though in fact it was as surely buried beyond power of resurrection as was the murdered Banquo. Why it should, after the lapse of half a century, and after having been repeatedly demonstrated to the contrary, be

thought to be a legitimate subject of controversy somewhat passes comprehension. In *Kneeland v. Milwaukee,* 15 Wis. 454, Justice PAINE, speaking of the source of information at hand as to the nature of the decision in the early case, said: "We get this from a written statement of the points decided, made soon after the decision, by the judge, then acting as reporter, and to whom the duty was assigned of writing the opinion," speaking of the identical paper, manifestly, from which we have quoted. Still further, in the opinion by the present chief justice, to which we have before referred, that same paper is indorsed as the one referred to by Justice COLE in *Knowlton v. Rock Co.* 9 Wis. 410. Then we find it incorporated in the original report of the case found in vol. 9 of the old edition of our Reports prepared by SMITH, ex-associate justice, acting as reporter, with his own certificate that it is the only opinion ever written in the case. If that, in the whole, does not put the truth of the matter beyond all reasonable doubt, then there is little use of effort to discover truth by evidence. The only reasonable explanation of the mist that has seemed to surround this matter for years is that the statement in the decision that the law of 1854 does not "impose a tax within the meaning of the constitution" voiced the deliberate judgment of Chief Justice WHITON and Justice SMITH, with which Justice COLE did not altogether agree, he believing that it was an exaction "in lieu of taxes ordinarily imposed: a condition of exemption from ordinary taxation and so taxation in the just and proper sense of that term;" really a distinction without a difference, since an exaction in lieu of ordinary taxation may well be a "tax in the just and proper sense of the term" and not be taxation on property "within the meaning of the constitution."

Having now shown clearly, as we think, that the controlling idea in the early decisions was as we have indicated, it next becomes important to show how the change came to be made

in the act of 1854 by the act of 1860. That legislation oc-
curred while it was supposed the former was fatally de-
fective. The legislature *ex industria,* as we shall show, en-
deavored to remove all features of the law of 1854 which
gave rise to the idea in the minds of some that it was a taxing
law to be tested by sec. 1, art. VIII, of the constitution.

It must be kept in mind that the legislature, in framing
the new act, had the benefit of the suggestions of the three
justices, DIXON, PAINE, and COLE, who participated in mak-
ing the decision condemning the early act as unconstitutional,
the opinion of Judge HUBBELL we have referred to, and the
three opinions in *Knowlton v. Rock Co., supra.* The nullify-
ing decision was filed early in the January term of 1860. It
was a startling revelation of the supposed weakness of one
of the most important revenue measures of the state. It cut
off most unexpectedly, since it was supposed the validity of
the law had been firmly established, a most significant source
of public revenue. That naturally stimulated the legislature
to exercise all the care that could be devoted to the subject,
to apply an efficient remedy: to devise a scheme that could
not be condemned because an unconstitutional taxing meas-
ure for any of the reasons suggested as to the former law.

The nullifying decision must have been carefully studied.
There is abundant evidence of that. It was noted that Jus-
tice PAINE, in delivering the leading opinion, said, in effect,
that the law of 1854 could not be sustained under the *police
power* because "a license is an authority granted to do that
which the licensee might not legally do without it" and that
the primary object in such a law is regulation, the revenue
feature being a mere incident. It was further doubtless
noted that he said the law did not contemplate *compensation
for the privilege of exercising the rights granted by the char-
ter,* "for that the charter gives, and the act does not profess
to give it." It was further observed that he gave significance
to the fact that "the legislature," as he said, "did not call

the tax a license, *but honestly called it a tax, as it is beyond question.*"

Likewise it was doubtless appreciated that Justice COLE was of the opinion that the percentage payment was required to be made as an equivalent for the advantage secured by the exemption from ordinary taxation; that such was the basis for the views of Justices WHITON and SMITH that the exaction was not a tax in a constitutional sense, since it could not be in lieu of a thing and be that thing also; and that Justices DIXON and PAINE could not agree with that because of features in the law inconsistent, to their minds, therewith.

In addition to the judicial suggestions the legislature had the benefit of the exhaustive argument of Mr. Ryan, wherein he presented, with great clearness and force, the view that the rule of taxation mentioned in the constitution refers to the *ad valorem* method of taxing property; that the words referring to property in connection with those expressing the idea of uniformity of rule made the former words of limitation as to subjects of taxation, and the latter words of limitation as to the methods of taxation, applying the maxim, as he thought should be done, *expressio unius est exclusio alterius.* That, of course, has not been indorsed by the court so as to exclude other forms of taxation than that on property. The circumstance is simply mentioned, among others, to show the situation under which the legislation of 1860 occurred. We may well say, however, in passing that the rule of construction which Mr. Ryan insisted should be applied was, during the time the constitutional convention was dealing with the particular subject, stated by one of the ablest lawyer members of the body to be the one which their perfected work would subsequently be tested by.

Now, in drafting the new law, the first feature of the former act, that in relation to the return of gross earnings, was, as we have seen, left as before. There was no possible doubt at that point.

Taking up the next feature: the one which made the court, speaking by Justice PAINE, regard the act of 1854 beyond room for reasonable doubt a taxing law under sec. 1, art. VIII, of the constitution because of the words "which amount of tax shall take the place and be in full of all the taxes . . . upon said roads," it was wholly discarded.

In view of the significance accorded to the feature of the law that the exaction could not be regarded in any sense as a license as "it does not purport to be a license," in the opening lines of the new act it was provided that every railway company "shall apply for and obtain a license."

Noting the importance given in Justice PAINE's opinion to the fact that the percentage payment provided for in the old law was not called compensation for the exercise of the franchise, and his suggestion that a license under the police power necessarily contemplates regulation primarily and incidentally revenue, and further the intimation that an exaction "analogous to the requiring of a bonus for the granting of charters" would not be an exercise of the taxing power, strictly speaking, in the new act the idea that the payment should be regarded as *consideration for the privilege of operating the road* and the evidence of the acquirement of that privilege *a mere certificate* of the facts as regards the making of the return and the payment of the percentage on gross earnings, was made prominent.

Then, whereas the old law was labeled "An act taxing railroads," etc., the new one was characterized in its title "An act regulating railroads."

Thus it will be seen that every judicial suggestion made in the three cases as to the former act being a taxing law under sec. 1, art. VIII, of the constitution was met in the new one exclusively and inclusively. The language in the former as to the exaction being in full for taxes was *ex industria* omitted. Care was exercised even to avoid using an expression conveying the idea that the exaction was to be

even in lieu of taxes. The idea that the act might be claimed to be a police regulation from the mere fact that application for a license was required, was repelled by the evidence of payment being denominated a "certificate to be evidence of the facts therein stated." The ideas of compensation for the right to exercise the franchise, analogous to a bonus for the corporate privilege of operating the road, though not that strictly speaking, impliedly suggested by Justice PAINE as legitimate, were adopted in place of the idea of payment of a sum of money "to take the place and be in full of taxes" or a consideration for exemption from taxation. To make it doubly sure that the new enactment would not be regarded as having any of those features which had led the court to hold the old one was void under sec. 1, art. VIII, of the constitution, and at the same time preserve, so far as it could be safely done in the light at hand, the feature of compensation to the state as an equivalent for exemption from ordinary taxation as well as compensation for the privilege of operating the road, as a companion piece of legislation an act was passed exempting railroad property from taxation, but without referring to the regulating act, so called.

In the Revision of 1878 the features of the law of 1860 were emphasized by making the obligation to pay the state a part of the gross earnings as compensation for the privilege of operating the road more prominent somewhat than before, and making the exemption of railroad property one of the features of the general statutory treatment of that subject, and without any express connection thereof with the other provision. True, the latter was included in a chapter on taxation under the head of taxes on various kinds of property, all indirect however, most of which were included in the exempt classes, but so was the scheme for obtaining revenue from insurance corporations, foreign and domestic. No one would claim that the exaction from that source is a tax in a constitutional sense. The idea was expressly rejected in

*Travelers' Ins. Co. v. Fricke,* 99 Wis. 367, 74 N. W. 372, 78 N. W. 407, Justice WINSLOW saying for the court: "It is not a tax under the decisions of this court." Such exactions are, as we have seen and will still further see, privilege taxes involving necessarily the element of contract.

With this history, why even adhere to the idea industriously discarded by the legislature in the act of 1860, that the system then so carefully devised, in a legal sense provides for payment of a percentage of gross earnings of railways to the state as consideration for exemption from taxation, though we do treat it as such in practical effect? Why not regard the purpose of the law to be in a legal sense what it says it is: one to obtain from railroad companies a part of their gross earnings as compensation for the privileges accorded to them to operate their roads and carry on their business; that the law, while referable in the broad sense to the power of taxation, involves an exchange of equivalents, a proposition by the state to accord certain privileges on condition, and an acceptance thereof? That would be its nature even if the exaction were in lieu of ordinary taxes, as we shall see, but more appreciably so in case of the new feature.

That the efforts of the legislature have since been supposed successful, is evidenced by the fact that in more than forty years that have elapsed since the enactment it has never been seriously questioned. The decision in *Kneeland v. Milwaukee,* 15 Wis. 454, was made some two years thereafter, but the action was commenced theretofore and involved only the act of 1854. The new enactment was referred to by Justice PAINE as if he regarded it in the light, somewhat, of an endeavor to do the same thing purposed by the old law, but in a new way. However, no opinion was expressed as to its legal character and none was called for. It was a valid enactment necessarily, since the former one was, and it is difficult to see how the result could be otherwise if the court had adhered to its condemnation of the earlier law. It has

never been held by this court a taxing law in a constitutional sense. It has never been analyzed and passed upon, the whole subject being allowed to rest on the adjudication as to the act of 1854. It could not be reasonably held a law for the ordinary taxation of property in face of the history we have given. Courts elsewhere are in harmony with these views, but our own decisions are so unmistakable on the subject that we shall not review or cite others except as it may be incidentally done in treating another branch of the case.

In view of the foregoing we can without further discussion eliminate some elements from the case which were exceedingly troublesome at the start in determining the right of the matter in controversy: elements the continuance of which as significant in the case would seem to require affirmance of the judgments.

If the legislative idea was a penalty for failure to pay a tax strictly so called, which it is not, it could no more be forgiven for mistake, whether excusable or not, than that to which it is incidental. As soon as the default occurred the penalty would be regarded in legal effect as part of the tax, especially since the law provides for an absolute forfeiture. We venture to say that in all tax laws where it is provided that upon default in payment being made a certain amount in addition to the tax shall be forfeited, upon the forfeiture occurring, the penal sum is regarded to be as fixed and certain in its obligatory feature as the tax itself. It is said, in effect, in 2 Cooley, Taxation (3d ed.) 900, that a penalty for neglect to pay a tax constitutes an addition to the tax. Judicial authorities so hold. *Louisville City R. Co. v. Louisville,* 4 Bush, 478; *Burlington v. B. & M. R. Co.* 41 Iowa, 134; *High v. Shoemaker,* 22 Cal. 363; *Kansas Pac. R. Co. v. Amrine,* 10 Kan. 318. That such was the intention of the legislature expressed in the act before us, especially in view of the significant word "absolutely," and that nothing but mere default is essential to its activity, would seem too clear

to be gotten rid of by any reasoning yet presented, if we were to regard the law as a taxing measure independently of any contract feature.

We venture the assertion that no authority can be found nor principle referred to sustaining the proposition that a statutory penalty for failure to pay an ordinary tax can be avoided on the 'ground of mistake or discharged otherwise than by full payment. The cases cited by respondent, *Mackay v. San Francisco,* 113 Cal. 392, 45 Pac. 696; *State v. Alta S. M. Co.* 24 Nev. 230, 51 Pac. 982, and *State v. Carson City Sav. Bank,* 17 Nev. 146, 30 Pac. 703, are to that effect, so far as they go. They do not apply to the case in hand because it does not relate to ordinary taxes.

If the law was a police regulation, which it is not, such a penalty for the transgression would be enforceable regardless of whether it was wilful or by mistake, excusable or inexcusable. The following cases cited by counsel for respondents are to that effect: *Brig Ann,* 1 Gall. 62, Fed. Cas. No. 397; 3 Greenl. Ev. (16th ed.) § 21; *Barnes v. State,* 19 Conn. 398; *Comm. v. Mash,* 7 Met. 472; *Comm. v. Boynton,* 2 Allen, 160; *Comm. v. Raymond,* 97 Mass. 567. But they do not apply. The cases and others of the same character which might be referred to, involve such transgressions as selling adulterated milk; selling liquor without a license; keeping naphtha for sale under a false name; furnishing liquor to minors; selling liquor to intoxicated persons; failure to cancel revenue stamps, and the like, contrary to law. In all such cases upon the general principles applicable to police regulation it is held that guilty knowledge or bad intent is not essential to the forfeiture unless the law makes it so. The principle does not apply here.

For the reasons already given, authorities cited by counsel for appellants dealing with statutes for the punishment of occurrences which, in their commission, necessarily involve the element of bad intent, do not apply, nor do statutes of a

penal nature, remedial in character in favor of the injured person for an act akin to one involving criminality, such as *Cohn v. Neeves,* 40 Wis. 393, and *Wright v. E. E. Bolles W. W. Co.* 50 Wis. 167, 6 N. W. 508.

Neither, it seems, would *Schumacher v. Falter,* 113 Wis. 563, 89 N. W. 485; *Johnson v. Huber,* 117 Wis. 58, 93 N. W. 826, and like authorities involving remedial statutes in aid of the enforcement of obligations growing out of contract relations apply, if the law, as claimed by counsel for appellants, was strictly speaking a taxing measure. We would then have to enter another and entirely different and, to our mind, barren field, to find clear warrant for reading out of it a meaning other than that which its literal sense suggests, since that was made so emphatic by use of the word "absolutely."

The taxing law, so called, under consideration, in the whole, as indicated, involved, in legal effect, an exchange between the state and the railroad company of equivalents. The former accords the latter the privilege to operate its roads; the latter, in consideration thereof, renders to the former a proportion of its earnings. By operating the road the company impliedly promises to pay the state the specified compensation for such privilege, which is fixed and certain, since it is based on past business. The state by permitting the operation of the road acquires as an asset the statutory right to the specified proportion of the previous year's gross income. That constitutes an indebtedness definite as to amount and time of payment, dischargeable only by payment like any other absolute obligation on contract for the payment of money, and collectible by ordinary remedies in case of default, if necessary. It is quite different in that respect from a tax in the ordinary sense, in that in the latter there is no element of contract involved and ordinary remedies are not usable to enforce payment in the absence

of statutory authority. We have adverted to that before, but it is so important in this case that we will add a little here to what has been said.

There is some confusion in judicial expressions as to whether an ordinary tax is a debt. Because it is a liability, it will be found sometimes spoken of as the former, no idea of the contractual element necessary to one strictly so called being in mind. As a rule, whenever any court has been required to decide whether such a tax involves such element the decision has been in the negative. One might easily be misled by reading the different expressions even of the same court on the subject, if the circumstances under which the varying expressions were used are not taken into consideration. For examples, in *Warden v. Fond du Lac Co.* 14 Wis. 618, 620; *Peters v. Myers,* 22 Wis. 602; *Marsh v. Clark Co.* 42 Wis. 502, 509; *Flanders v. Merrimack,* 48 Wis. 567, 572, 4 N. W. 74; *State ex rel. Davis & Starr L. Co. v. Pors,* 107 Wis. 420, 425, 83 N. W. 706—an ordinary tax is in each instance spoken of as a debt, the precise nature of the liability, however, not being involved. In *In re Assignment of Riddell,* 93 Wis. 564, 67 N. W. 1135, such question was directly involved and the conclusion was that such taxes are not debts in the ordinary sense, Cooley on Taxation and other authorities being cited, which hold that they do not involve any contractual element. Again at one time in Iowa the court was inclined to treat such taxes as debts, and to hold that ordinary remedies were usable to collect them. During such period they will be found spoken of as debts, though there was not entire harmony, by any means, as to whether they were collectible as ordinary contractual obligations, nor was there any definite decision to that effect. *Dubuque v. Ill. Cent. R. Co.* 39 Iowa, 56; *Burlington v. B. & M. R. Co.* 41 Iowa, 134. Later that idea was criticised and still later entirely discarded. *Marshall Co. v. Knoll,*

102 Iowa, 573, 69 N. W. 1146, 71 N. W. 571; *Crawford Co.
v. Laub,* 110 Iowa, 355, 357, 81 N. W. 590; *Plymouth Co.
v. Moore,* 114 Iowa, 700, 701, 87 N. W. 662.

All text-writers and judicial authorities substantially agree
that the distinguishing feature between a debt and a tax, in
the ordinary sense, is that in case of the former there is ex-
press or implied promise to pay, enforceable by ordinary
remedies, and in case of the latter such element does not
exist and such remedies are ordinarily not applicable. *Car-
ondelet v. Picot,* 38 Mo. 125; *Peirce v. Boston,* 3 Met. 520;
*Camden v. Allen,* 26 N. J. Law, 398; *State ex rel. Hayes
v. Snyder,* 139 Mo. 549, 553, 41 S. W. 216; *Blevins v.
Smith,* 104 Mo. 583, 595, 16 S. W. 213; *Augusta v. North,*
57 Me. 392; *Shaw v. Peckett,* 26 Vt. 482; *Loeber v. Lein-
inger,* 175 Ill. 484, 51 N. E. 703; *Mechanics' & T. Bank
v. Debolt,* 1 Ohio St. 591; *Danforth v. McCook Co.* 11
S. Dak. 258, 76 N. W. 940; *Hibbard v. Clark,* 56 N. H.
155; *State v. Southwestern R. Co.* 70 Ga. 11; Burroughs,
Taxation, § 105; Blackwell, Tax Titles (5th ed.) § 335;
1 Desty, Taxation, § 6.

A few quotations from the cases cited will indicate how
very emphatic the distinction we have pointed out is made
by the authorities.

"Nor are taxes contracts between party and party either
express or implied." SHAW, C. J., in *Peirce v. Boston, supra.*

"The existence of a contract either express or implied is
the ground on which interest is generally allowed. The as-
sessment of taxes does not create a debt that can be enforced
by suit or upon which a promise to pay interest can be im-
plied." ISHAM, J., in *Shaw v. Peckett, supra.*

"A tax in its essential characteristics is not a debt, nor
in the nature of a debt." "It is not founded on contract or
agreement." "A debt originates and is founded upon con-
tract, express or implied." "Unless the power is expressly
delegated or expressed, no right of action exists for taxes."
WAGNER, J., in *Carondelet v. Picot, supra.*

"Taxes are not debts in the ordinary sense of the word." "They are not contracts either express or implied. They cannot be collected by suit at law in the absence of express statutory provision." *State v. Southwestern R. Co., supra.*

Recurring to the character of the law under consideration, the feature as to the report is a mere instrumentality to enable the state to determine the measure of the consideration to be rendered to it as the equivalent of the privilege it accords. The issuance of the license creates evidence, but *prima facie* evidence only, of full payment of such consideration. The requirements as regards the report and the license being such mere instrumentalities in aid of collecting the compensation to be rendered to the state, are not the measure of it. The penal provisions, the same as those relating to the report and the license, are merely administrative in character, intended to operate persuasively as regards performance of duty, the primary duty being to fully perform the agreement to pay the specified percentage growing out of the acceptance of the offered privilege to operate the road, and intended also to operate punitively as to the nonperformance of duty. We cannot emphasize too much that difficulty has grown out of confusing the power of taxation under sec. 1, art. VIII, of the constitution, the police power, and power as to privilege taxes involving the contracting power to some extent. In no field is that more apparent than in that of dealing with laws of the character of the one under consideration. It has been significantly in evidence in this case in the treatment of the subject by the learned counsel for the respective parties. It has many times been held that a law exempting property from taxation coupled with an obligation to contribute to the public funds other than by taxation in the ordinary sense: direct taxation of property, in consideration of some privilege granted by the state within its power to grant, refuse, or prohibit, is valid and creates a contract between the owner of the property and the state.

*Louisville City R. Co. v. Louisville,* 4 Bush, 478; *Newport v. South Covington & C. R. Co.* 89 Ky. 29, 11 S. W. 954; *Pac. R. Co. v. McGuire,* 20 Wall. 36; *State v. Miller,* 30 N. J. Law, 368; *Mobile & O. R. Co. v. Tennessee,* 153 U. S. 486, 14 Sup. Ct. 968; *Wilmington & W. R. Co. v. Alsbrook,* 146 U. S. 279, 13 Sup. Ct. 72; *Mobile & O. R. Co. v. Moseley,* 52 Miss. 127; *State Board v. Morris & E. R. Co.* 49 N. J. Law, 193, 7 Atl. 826; *Dodge v. Woolsey,* 18 How. 331; *State v. Butler,* 86 Tenn. 614, 8 S. W. 586; *Detroit City St. R. Co. v. Guthard,* 51 Mich. 180, 16 N. W. 328. No constitutional provision on the subject of taxation of property is involved in such a law except that feature permitting exemptions from taxation.

In the very latest expression of the federal supreme court on this subject (*Powers v. Detroit, G. H. & M. R. Co.* 201 U. S. 543, 26 Sup. Ct. 556), the law then under consideration characterized the exaction as a tax and so it was called over and over again in the opinion by Mr. Justice BREWER. But it was held that the obligation upon which it was based was contractual and the court treated the law as not dealing with taxes in the ordinary sense. It provided that "said company shall, on or before the 1st day of July, pay the state treasurer an annual tax of one per cent. on the capital stock of said company paid in, which tax shall be in lieu of all other taxes, except penalties imposed upon said company by its act of incorporation or any other law of this state. The said tax shall be estimated upon the last annual report of said corporations." The enactment was in the nature of an amendment to an existing corporate charter enlarging the original scope thereof. The court held that the legislation and the action of the railroad company in respect thereto created a contract *inter partes;* that the tax, so called, which it contemplated, was one based on such contract and hence that the state could not violate the obligations thereof any more than it could those of any other contract. We should say in passing that the circumstances of the case did not

render necessary consideration of the subject of altering a corporate charter under reserved power in that regard.

Now can there be any reasonable doubt, on principle, that such a law as that of 1860 is in the nature of an act amending existing corporate charters under the constitutional reservation of the right to do so, and that a subsequent exercising of corporate rights created contractual relations between the state and the corporation as regards the new feature the same as if such feature were originally made a part of the charter? No one will doubt but what the grant of a charter and its acceptance creates a contract between the grantor and the grantee, or but what after such acceptance the contract could be changed by the legislature under the reservation of authority in that regard in the constitution, which is regarded as written in every corporate charter, so long as it acts reasonably. This court passed upon that in *Att'y Gen. v. Railroad Cos.* 35 Wis. 427, and it is familiar law. Where is there any room to escape the conclusion that a law of the nature of that under consideration, the same as the rate law considered in the case cited, is such an amendment and while referable to the power of taxation in a general sense is, otherwise, referable to inherent contracting power, the constitutional reservation of authority to vary contracts between the state and corporations involved in corporate charters, and the power to exempt property from taxation? Call the exactions under the railway license law taxes, and we may, and properly so, in the sense that they constitute part of the state revenues, they are yet not strictly such in the sense that they spring from activity of the taxing power in a constitutional sense: the power to tax property. No court has ventured to say that they are taxes in any other sense than that the law authorizing them is a revenue law, and that the result of its execution is the same as that of a taxing measure, strictly so called, as regards affording the necessary means to meet public expense.

There can be no difference as regards contractual relations

between an accepted offer to a foreign corporation and one to a domestic corporation of the privilege to do business in the state, the condition of the offer being the rendition of a stipulated revenue to the state. In the latter circumstances upon due consideration this court held that the transaction in legal effect involved an implied promise to pay according to the terms of the offer. *Travelers' Ins. Co. v. Fricke,* 99 Wis. 367, 74 N. W. 372, 78 N. W. 407; *State ex rel. Fidelity & C. Co. v. Fricke,* 102 Wis. 107, 77 N. W. 732, 78 N. W. 455; *State v. Nat. Acc. Soc.* 103 Wis. 208, 79 N. W. 220.

The idea suggested that the exaction of compensation from a domestic corporation for the privilege of exercising its franchises within the state, as regards the contractual feature, is the same as such an exaction of a foreign corporation, making the decision in *Travelers' Ins. Co. v. Fricke,* 99 Wis. 367, 74 N. W. 372, 78 N. W. 407, directly in point in the present discussion, is fully supported, if support therefor were needed, by the decision in *State v. Grand Trunk R. Co.,* opinion by Mr. Justice FIELD, 142 U. S. 217, 12 Sup. Ct. 163, by this language:

"The privilege of exercising the franchises of a corporation within a state is generally one of value and often of great value. It is natural, therefore, that the corporation should be made to bear some proportion of the burdens of government. As the granting of the privilege rests entirely in the discretion of the state *whether the corporation be of domestic or foreign origin, it may be conferred upon such conditions, pecuniary or otherwise, as the state in its judgment may deem most conducive to its interests or policy."*

The irresistible logic of these cases and the principle to which we have referred compels the conclusion that an accepted offer, under the system of legislation here, creates contractual obligations that cannot be discharged otherwise than by rendering the full amount contemplated by the promise. In *State v. Nat. Acc. Soc., supra,* the action on implied contract for arrears covering several years was sustained, and

during all that period the debtor, so to speak, possessed a license issued in due form, but under mistake as to the right thereto.

On the question of whether the law under consideration is referable to the constitutional power to exempt property from taxation and to do it by contract, not to the power in a constitutional sense to tax property, and referable to the power to amend the contractual obligations existing between the state and the grantee of its corporate franchise, we have rested, especially on the last proposition, largely on principle, but the subject has been passed upon by courts in the very broadest aspect of the matter we have taken and in harmony with the views we have expressed. In *Jersey City G. L. Co. v. United G. I. Co.* 46 Fed. 264, the subject treated was whether such a law as we have here is a taxing law, under a constitutional provision like our sec. 1, art. VIII, in all essential particulars, or an amendment of the corporate charter under the reserved power in that regard varying the contract between the state and the holder of the franchise by imposing a new condition on the enjoyment of the corporate privilege. The similarity of the law in question there to the one here can be best appreciated by the following quotation from the former:

"Every telegraph, telephone, cable, or electric light company, every express company not owned by a railroad company and otherwise taxed, every gas company, palace or parlor or sleeping-car company, and every oil or pipe-line company, and every fire, life, marine, or accident insurance company, doing business in this state, except mutual fire insurance companies which do not issue policies on the stock plan, shall pay an annual tax, for the use of the state, by way of license for its corporate franchise, as hereinafter mentioned."

There were further provisions as to return of gross earnings, the percentage of such earnings to be paid, and the remedies for failure to pay. The law was evidently passed to

place the taxation of such corporations under somewhat the system for taxing railroads. The administration of the law in part was delegated to the railway and canal commission. The federal circuit judge in deciding the issue said:

"When the legislature grants a charter of incorporation, it confers upon the grantees of the charter the right or privilege of forming a corporate association, and of acting, within certain limits, in a corporate capacity, and this right or privilege is called the 'corporate franchise.'" "The legislative authority in making a grant of such franchise can prescribe such terms and such conditions for its acceptance and for its enjoyment as to it shall seem best." "It is true that such grants are said to be in the nature of a contract. But if the right to amend or to alter or to repeal the grant be . . . reserved . . . the terms and conditions originally annexed to the grant, although accepted, . . . do not become irrepealable contracts, but may be altered . . . at the will of the grantor." "It has seen fit to exercise this discretion, and to impose upon the plaintiff a new condition, upon compliance with which it can continue to enjoy the franchises," being "the payment of an annual tax, or charge, or impost by way of license." "Its franchises are preserved to it, but the use of those franchises is made to depend upon the payment of the license fee." "It is difficult to imagine any other construction which will preserve the least harmony between the act in question and the constitution of the state."

We have quoted thus at length because the case so clearly declares and applies the views we have expressed. The federal court, in making the decision, cited and followed the decision in *Standard U. C. Co. v. Att'y Gen.* 46 N. J. Eq. 270, 19 Atl. 733, which involved a railroad taxing law substantially like the one under consideration. The contention was made that the law was void under the clause of the constitution similar to our sec. 1, art. VIII. The court answered it thus:

"The fault of this position is the assumption that this tax is one upon property. Such manifestly is not the case. The law imposes a tax by way of a license for exercising corporate

franchises." "Upon the power of the legislature to impose such a tax there exists no restriction in our constitution. As a license or franchise tax it is not within the equality clause of the constitution" in relation to the taxation of property.

Before we proceed to apply the foregoing we desire to further emphasize the idea that the railway license taxes, so called, are properly referable to the taxing power in the broad, "the just and proper sense, of the term." The saying, they are not taxes "in a constitutional sense," means they are not those enforced proportional contributions, from or on account of property, for the public needs, mentioned in sec. 1, art. VIII, of the constitution: taxes involving the mere reciprocal duties of support and protection as between the sovereign and those in its jurisdiction, and not characterized at any point in the process by which the contribution reaches the public treasury by implied promise to pay, in a contractual sense. It is a special form of taxation: of raising revenue, and so, properly speaking, means the exercise of taxing power. It differs from the ordinary form, mentioned and having its special limitations in the constitution, in that it is neither direct on property nor does it involve merely the reciprocal duties mentioned. The addition to the public funds is made, in any instance, by the process of offering a privilege, under sovereign control to do so or not, and an acceptance, with the resulting element of implied promise to pay the required compensation. In that lies the contractual feature. While such process, to a greater or lesser degree, has the element of compulsion, very much as in case of ordinary taxes, yet the initiative is in the nature of an offer of something which, in contemplation of law, the sovereign may bestow or not at its pleasure, and with or without conditions, and which in such contemplation the one to whom the offer is made is at liberty to accept or reject. In case of the former alternative being chosen, by operation of law, on familiar principles, the implied promise to pay re-

sults, which must necessarily be of the same dignity as any other such promise, as regards rights and remedies.   True, the interest, and in that sense the liberty, to accept or reject the offer and privilege, is much greater in case of its being contained in the charter of a corporation at the beginning than when made thereafter.   True, such an offer at the start and acceptance, having no necessary reference to taxation, might doubtless be regarded as the mere sale of a privilege : a matter resting wholly in contract and so not referable to the taxing power at all.   But if at the beginning, expressly or plainly, the contribution is contemplated to be in lieu of ordinary taxation, as taxation in an indirect way and in general effect, as in the instances cited in the opinion, and as is commonly the case, then it may well be regarded as a tax, in the broad sense : an exaction referable to the taxing power, with the contractual element, however, specializing it.   In that view, such an exaction, it would seem, should be regarded and treated the same as one under a general law, making submission thereto a condition of continuing existing corporate privileges or business, as regards the contract feature.

Further, on the matter last mentioned, we refer to *State ex rel. Bain v. Seaboard & R. R. Co.* 52 Fed. 450.   There an exaction of an annual payment to the state as a condition of exercising an accepted corporate franchise, the same to be in lieu of all other taxes, was held to be a matter of contract, and that it would be difficult to sustain the tax under the constitution as a property tax.   The action was to recover arrearages for twenty-five years.   It was held that the exaction was something due to the state, but not in the nature of taxes on property.   "The right of the state," said the court, "to collect the amount sued for does not grow out of its power to tax, but out of its power to charge a price for the franchise granted."   "It is not a tax on the property of the road."   "It is an imposition annexed to the franchise . . . ; the contract price to be paid . . . for the franchise granted."   For

that reason it was said that no technical rules relating to taxes are involved. The right of the matter depends "on the ordinary rules relating to the construction of contracts." "The tax is a charge agreed upon between the parties and has nothing to do with anything other than the contract itself." In that view and under the law as regards the statute of limitations on contract obligations to the state, the right to recover for the twenty-five years of arrearages was sustained.

The most serious difficulties in this case have now been cleared away, including the ground, it seems, upon which the learned trial court based the judgments appealed from. In this we assume that it was thought the matter should be treated the same as penal statutes in aid of the collection of taxes, or a police regulation, and that the words "or any part thereof," which originated in the law of 1862, where permission to pay in instalments was granted, made the penalty apply to a part, however small, the same as to the whole. Such statutes in aid of the enforcement of duties springing from contractual relations do not seem to have been given careful, if any, consideration. Manifestly there is a wide difference between laws relating to the former and those relating to the latter. In construction there is quite as much difference in degree, though the manner of treatment is the same, between the two, as there is between the former and a stipulated forfeiture in private contracts. Numerous instances might be referred to, where remedial statutes to secure performance of contractual duties have been held, notwithstanding their literal sense to the contrary, to apply only to cases of failure to perform through inexcusable conduct. *Schumacher v. Falter,* 113 Wis. 563, 89 N. W. 485; *Johnson v. Huber,* 117 Wis. 58, 93 N. W. 826, are significant cases on that in this state and have established a definite rule here on the subject. They are to the effect that excusable mistake, whether of law or of fact, prevents infliction of a statutory penalty merely designed to stimulate performance

of contractual duties or punish failure to perform, in the absence of something in the law expressly indicating to the contrary; that mere general language, covering defaults without express exception or qualification, will not be held to apply to failure of duty from honest belief, based on reasonable ground, that the circumstances existing do not give rise to duty of performance. The basic theory of these cases is that the court will apply substantially the same rule of construction to such statutes as is applicable to stipulated forfeitures in ordinary contracts, to the extent of determining whether they were intended to apply literally or not, the presumption being indulged in, that nothing absurd or unreasonable was in the legislative mind, and that when the literal sense would lead to the contrary it should- be restrained accordingly, by a somewhat arbitrary assumption that the legislature had in mind defaults only of a nature in harmony with the remedial feature provided, in the absence of some clearly expressed indication to the contrary. That rule for construction may not, as said in *Seeman v. Biemann,* 108 Wis. 365, 84 N. W. 490, be very logical, but it is a just one and has been so firmly established that it may well be thought to be in the legislative mind in enacting laws, the same as it is presumed to be in the minds of parties in entering into contractual relations.

The foregoing stated principle rules these cases in favor of the appellants, unless we can discover in the law the negative indication suggested. On this the significant word "absolutely" preceding the word "forfeit" before referred to is prominent. It is suggested that the interpolation of that word made in the Revision of 1878 did not add to the word "forfeit" standing by itself. That may be so in the abstract, but it does not follow that the legislature used the additional word purposelessly. We must assume to the contrary, by a very familiar rule of construction. That assumption will not down easily under the circumstances we have

here. The revisers could have joined the penal provision of sec. 184, ch. 18, R. S. 1858, the particular one involved here, and the penal provision of the act of 1860, making a perfect piece of legislation, without the use of the word "absolutely," so industriously interpolated. We do not overlook the fact that the revisers failed to record in their notes any reason for the change. Giving due consideration to this it does not help the matter materially. We cannot escape from the conclusion that the addition was made advisedly and for a particular purpose well defined in the minds of the revisers and the mind of the legislature. If that purpose was to negative the idea that in case of default in any respect, circumstances might efficiently excuse it and prevent the forfeiture, then the rule of the cases cited cannot prevail. Here, again, the doctrine applies that a meaning should not be attributed to the legislature, convicting it of unreasonable or absurd action, if that can be avoided.

It goes without saying that in making a report by a railroad company of its gross earnings covering a year's business, and making the payment which the statute requires, there is room for many mistakes of an excusable nature: mistakes involving trifling or very large sums: mistakes of law and mistakes of fact, or both: mistakes requiring the best of expert accountants, and the highest order of legal and judicial ability to determine the right of the matter. If the penal provision has the broad application contended for by respondent, upon default in payment of any considerable part of the license fee, let it be $500 or $100,000, any part, however small, so long as it does not fall under the rule of *de minimis non curat lex,* up to the whole, even without the circumstances characterizing the default being such as to indicate any real fault whatever, the forfeiture would be incurred, without hope of relief. The circumstances might be such as to exhaust all the instrumentalities of the law in honest controversy, before vindication of the right could be secured,

and yet the forfeiture would follow just the same as in case of manifest fraud or inexcusable neglect. It does not seem possible that the legislature could have so intended. The contrary would shock the conscience of any considerate man. The contemplation of it gives the judicial mind pause and compels diligent search for some other intent, fairly expressed. If the failure to make a correct report and pay the full amount could result in any permanent loss to the state, it might change the picture. There would then appear to be some warrant; perhaps a good one: an efficient one, for so drastic a statute as the learned trial court regarded the one in question to be. But such is not the case, as we have perhaps sufficiently shown.

As indicated at the start, we would have preferred leaving the question last suggested for future decision, but the necessities of the situation preclude it. That compelled broadening our consideration of the cases, so as to include several matters which would otherwise have been omitted. The whole case might, under some circumstances, have turned on whether failure to pay would necessarily result in any loss to the state. In that condition of the law reason for a pretty harsh penalty for even a mistake would exist. A strong stimulus to exercise extraordinary care would not be unreasonable. Since there is no such danger there is no reason for applying so drastic a penalty as the one under consideration, for neglect not involving any real fault. Not only is the right of the state to the full amount of the percentage of gross earnings not impaired by its having acted upon the erroneous report, but it doubtless had the remedy, among others, to enforce the obligation suggested by the words of sec. 1212, that the license granted in any case shall be good for a year "unless sooner revoked." It is suggested that the reserved power of revocation was granted with reference to the second half of the license fee payable six months after the issuance of the license. We see no good reason for so restricting the meaning. The power of revocation, it seems,

was intended for use in any case of default, the same as was held in regard to licenses issued to insurance companies. *Travelers' Ins. Co. v. Fricke,* 99 Wis. 367, 74 N. W. 372, 78 N. W. 407.

In fencing this case within the very narrow compass indicated, by putting outside the pale the idea that the law is referable to ordinary taxing power, the one that it is referable to the police power, and the idea that default in making voluntary payment of the full proportion of earnings due the state could prejudicially affect its right to recover the balance—and reducing the situation down to one of mere innocent breach of obligation to voluntarily pay the full sum of money due on implied agreement: fully remediable by action of debt as in *State v. Nat. Acc. Soc.* 103 Wis. 208, 79 N. W. 220, and *State ex rel. Bain v. Seaboard & R. R. Co.* 52 Fed. 450, leaving no reason for an absolute forfeiture to cover a possible loss—we still are confronted by the fact that the legislature must have considerately emphasized the word "forfeit" by adding thereto the word "absolutely." We cannot put that aside lightly. If put aside at all, it must be done by reasonable construction, not by arbitrary rejection because of the thought that the meaning of "forfeit" is not, in the abstract, made different by using it in connection with the adverb "absolutely."

The unreasonableness, nay the absurdity, of the literal sense of the words under consideration in view of the case as we now find it, compels turning aside therefrom if any way can be discovered which may fairly be said to have been intended by the legislature.

It seems that such a way is open and is now quite plain. The legislature did not intend the forfeiture to apply in case of excusable mistake of fact or law or both, one involving some matter of doubt or difficulty of such serious nature as to reasonably require judicial interference for its solution. We are permitted to hold that by familiar rules of construction. It appreciated, or must be presumed to have appre-

ciated, that the penalty was made incidental to breach of a
contract obligation and that as such it might be regarded, if
the idea was not expressly repelled in some way, as open to
the liberal treatment customarily given by courts to penal
provisions in contracts between private persons, as intending
that in case of inexcusable default the penalty should be re-
garded in the nature of stipulated damages, and as not af-
fecting, in any way, liability upon the contract for arrears
in case of the breach having relation to that subject.   Such
intent was made manifest by emphasizing the word "forfeit"
by preceding it by the word "absolutely."

Construing the law in question as indicated, as we well
may, supported by the logic we have applied to the matter,
clears up all obscurities, avoids all absurdities, makes the
law a sensible highly reasonable enactment in all its parts,
and grounds the reversal which must result from all the con-
siderations, on a thoroughly logical basis.   It secures to the
state the full consideration which the law contemplated for
the privilege granted, and an additional sum by way of pun-
ishment in case of any wrong that could be reasonably dig-
nified as such upon principles of natural justice.   It cannot
fairly be presumed that more was intended in the absence of
language not open, reasonably, to be otherwise read.   The
railway companies are held immune from punishment for
honest and not unreasonable defaults, while being held liable
to punishment for all others and to make good to the state the
full consideration impliedly agreed to be paid for the priv-
ileges enjoyed.   It could not be presumed that less was in-
tended by the legislature in view of the general nature of
the enactment, and in absence of language expressly, or
clearly by implication, so indicating.

*By the Court.*—The judgment in each of the four actions
is reversed, and the causes are remanded to the trial court
with directions to render judgment in each thereof dismissing
the same.

The following opinion was filed June 25, 1906:

Dodge, J. (*concurring*).  I concur in the judgment of
this court on the one ground, stated in the opinion, that a
construction of sec. 1214, Stats. 1898, to impose the penalty
by it denounced upon an entirely innocent mistake of fact
or law in a *bona fide* effort to comply with secs. 1211 and
1212, Stats. 1898, would be so absurd that we cannot at-
tribute such an intention to any legislature whose acts must
be presumed to be dictated by reason.  The section in ques-
tion is so highly penal and so drastic as to be, in effect, a
criminal statute.  The legislature, if exercising reason at
all, could not fail to realize that in the preparation of a re-
port of gross earnings of a great railroad there must arise
multiplicity of questions of the utmost doubt and complexity
as to what properly constitutes gross earnings.  Are earnings
on interstate business to be included?  Are receipts of money
which must be repaid, such as the gross charge on mileage
tickets, of which a portion is to be refunded?  Are payments
made between different railroads for switching, transfer, or
trackage charges, or for use of each other's cars, earnings
or only a method of keeping account of mutual accommoda-
tions, of which only the balance in favor of either road can
be considered earned?  The case of *State ex rel. Abbot v.
McFetridge,* 64 Wis. 130, 24 N. W. 140, holding that only
the balance of mutual account for car service is to be so con-
sidered, illustrates the opportunity for honest difference of
opinion.  Again, there is the probability of all sorts of errors
and mistakes, even down to clerical or arithmetical ones, at
the hands of the army of men of all grades of intelligence
and capacity upon whose acts and statements must be based
the accounts of the general offices and the report to the state.
These are cogent reasons why the rules for construction and
application of penal statutes announced in *Schumacher v*

*Falter,* 113 Wis. 563, 89 N. W. 485, and *Johnson v. Huber,*
117 Wis. 58, 93 N. W. 826, should control. No fair rea-
son to the contrary is apparent or is suggested in the opinion.
It is said that such construction is not permissible to a stat-
ute imposing a penalty for failure to pay a tax for some oc-
cult and unexplained reason. A glance at the authorities
cited must satisfy one that they have no application to such
a statute as this, but merely to those augmentations of a tax
which become part of and are collected with the tax in the
same proceeding. Mr. Cooley (2 Taxation [3d ed.] 901)
refers to cases where even such penalties have been denied,
where nonpayment of a tax was due to a reasonable doubt of
its validity. *Litchfield v. Webster Co.* 101 U. S. 773; *Savan-
nah, F. & W. R. Co. v. Morton,* 71 Ga. 24; *In re Miller's
Estate,* 182 Pa. St. 157, 37 Atl. 1000; *Comm. v. Phil. & R.
C. & I. Co.* 145 Pa. St. 283, 23 Atl. 809. Beyond this one
point I consider the discussion contained in the opinion im-
material and unnecessary. Much of it forestalls questions
which we know to be presented in pending cases and which
have not been argued at all fully upon either side.

I especially disagree with the contractual doctrine which
I understand to be advanced in the opinion. Its fallacy is
apparent from the consideration that the license-fee taxation
in lieu of exemption of all other taxes applies as well to nat-
ural persons owning public utilities covered by it, and, if a
contract, must be beyond the power of modification as to
such persons, whatever reserved rights the legislature may
have over corporations, domestic or foreign. I look upon
the imposition under these license-fee statutes as "taxation"
in the sense of that word in sec. 1, art. VIII, of our consti-
tution, and think the arguments and deductions to the con-
trary unwarranted by anything said by this court, fairly and
judicially considered, or by anything in the history of the
constitutional convention.

State v. Railway Cos. 128 Wis. 449.

The following opinion was filed July 16, 1906:

CASSODAY, C. J. (*concurring*). I fully concur in the reversal of each of the four judgments in these cases. The case presented, in my opinion, fails to show that the defendants have incurred the penalty prescribed by the sections of the statutes upon which the several actions were brought. But I dissent, respectfully, from so much of the opinion of the court as holds, or tends to hold, that the exactions by the state from railway companies during the fifty years immediately preceding the present *ad valorem* tax law were not taxes upon property within the meaning of the provision of the constitution which declares that "the rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall prescribe." Sec. 1, art. VIII, Const. I will briefly state the grounds of my dissent.

Of course, as often held by this and other courts, that provision, though affirmative in form, is not a grant to, but a limitation upon the powers· of, the state legislature. *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 59, 8 N. W. 833; *State ex rel. Graef v. Forest Co.* 74 Wis. 610, 615, 43 N. W. 551; *State ex rel. Weiss v. District Board,* 76 Wis. 177, 210, 44 N. W. 967; *State ex rel. Lamb v. Cunningham,* 83 Wis. 90, 146, 147, 53 N. W. 35; *Bittenhaus v. Johnston,* 92 Wis. 588, 595, 66 N. W. 805. Such limitation was for the manifest purpose of protecting citizens and taxpayers from oppressive taxation. 1 Cooley, Taxation (3d ed.) 7–10. As "the power to tax involves the power to destroy," so, in the absence of constitutional limitation, "the only security against the abuse of this power is found in the structure of the government itself," since, "in imposing a tax, the legislature acts upon its constituents." *McCulloch v. Maryland,* 4 Wheat. 316, 428; *Pollock v. Farmers' L. & T. Co.* 158 U. S. 601, 15 Sup. Ct. 912. Whether the exactions from railway companies, mentioned, constituted taxes upon such

property, ought to depend upon fixed standards which all are bound to recognize. Certainly, such standards are not to be found in the process of reasoning—sometimes permissible—of inclusion and exclusion. To assert that taxes levied upon property for the purpose of revenue by a particular method give to the owner the protection of the constitutional provision quoted, but that taxes levied upon the same or a portion of the same property, or other property, for the purpose of revenue by a different method, give to the owner no such protection, is to declare, in effect, that such constitutional provision gives no protection unless the legislature happens to prescribe such particular method. In other words, it makes the question of such protection to turn upon the choice of methods by the legislature, notwithstanding the taxes in either case are levied upon property for the purpose of revenue. Certainly a limitation which is thus optional, or to be applied only when convenient or desirable, is no limitation.

In determining the question above suggested, and in view of the language of the constitution quoted, it is unnecessary to consider here such exactions, by way of taxes in the general sense, as are not based upon nor measured by property or the income of property, whether they are made under the police power of the state in prescribing regulations affecting the lives, limbs, health, comfort, good order, morals, peace, and safety of society, or as exactions for special privileges or licenses granted. The exactions of moneys under the police power are generally for the purposes of regulating the relative rights, privileges, and duties between individuals, the conservation of order, the encouragement of industry, and the discouragement of pernicious employments. 2 Cooley, Taxation (3d ed.) 1125, 1126. The exactions of moneys under the taxing power are generally for the purposes of revenue. Id. Such distinction should be observed in con-

sidering the nature of the exactions in question from railroad companies. Where a railway runs through a state or a considerable portion thereof, its value includes not only its roadbed, depot grounds, rolling stock, and right of way, but its franchises and its corporate rights to operate the same; and hence its value for the purposes of taxation can be most satisfactorily ascertained by regarding the whole railway as a unit. 1 Cooley, Taxation (3d ed.) 693–700. This seems to be expressly held in *Chicago & N. W. R. Co. v. State, post,* p. 553, 108 N. W. 557. It is very obvious that it would be very difficult, if not impossible, to ascertain such value through town, city, and municipal agencies, since the small section of the railroad located in any town, city, or municipality, by itself, would be of little or no value, but as constituting a part of the whole line would be of great value. *Yellow River Imp. Co. v. Wood Co.* 81 Wis. 554, 560, 562, 51 N. W. 1004, and cases there cited. In the language of my brother MARSHALL in the *ad valorem* case cited: "It is the logical basis of the numerous decisions holding it to be necessary to justice and uniformity of rule in taxing laws that the property of a railway corporation be *assessed as a unit;* the physical things being regarded as merged in that produced by union with the franchise element as the one of primary importance"—citing numerous cases in support of the statement.

Seemingly inspired by such necessity, the legislature of 1854 devised a system of assessing such railway property as a unit, and fixing the amount which each corporation was required to pay at a certain per centum of its gross earnings. Ch. 74, Laws of 1854. That chapter is entitled "An act taxing railroads and plank roads." The first section of the act required every railroad or plank road company to make out and return to the state treasurer, on or before January 10th of each year, a true and just verified statement of its

"gross earnings . . . for the preceding year up to the 1st day of January." The second section declared:

"It shall be the duty of the said railroad companies and plank road companies to pay or cause to be paid to the treasurer of the state for the use of the state, on or before the 10th day of January in each year, *a sum equal to one per centum of the gross earnings of their respective roads so returned, which amount of tax shall take the place and be in full of all* of the taxes of every name and kind upon said roads, or other property belonging to said companies, or the stock held by individuals therein, and it shall not be lawful to levy or assess thereupon any other or further assessment or tax for any purpose whatsoever."

That was followed by a provision applicable when the road was partly in this state and partly in another. Secs. 3 and 4 of that chapter prescribed penalties for failure "to comply with the requirements" of the act. Sec. 5 of the act made it the duty of the treasurer of the state to

"ascertain, as near as may be, the gross earnings of such delinquent company, and assess thereupon the said one per centum, and shall seize and lay upon the whole or any part of the property, rights, and franchises of said company, and after giving ten days' public notice of the time and place of sale, shall proceed to sell at public auction the same, to satisfy the amount thereof, together with all costs and disbursements . . . incurred in making such assessments and sale thereof."

That act went into effect April 10, 1854. It appears upon its face to have been for the sole purpose of raising and collecting public revenue "for the use of the state." This is conceded in the opinion filed. There was nothing in the act regulating or attempting to regulate such roads in any way. It certainly was not a police regulation. It was purely a revenue measure, and hence, as indicated, a method of levying, assessing, and collecting taxes from such companies, "which amount of tax" was to "take the place and be in full of all of the taxes of every name and kind upon said roads;"

and it was therein declared not to "be lawful to levy or assess thereupon *any other or further assessment or tax* for any purpose whatsoever." Such prohibition against such levy or assessment thereupon of "any other or further assessment or tax" was in effect declaring that the exaction made by the act itself was the assessment and levy of taxes. Except as to a slight change as ·to the time for making the return to the state treasurer, such statutes continued in force until 1860. Secs. 182–186, ch. 18, R. S. 1858; ch. 140, Laws of 1859.

Notwithstanding the plain language employed and the express purpose of the act, it is now said that ch. 74, Laws of 1854, did not impose a tax on railroad property, nor a tax at all, within the meaning of sec. 1, art. VIII, of the constitution; and this seems to be put upon the ground that this court so held more than fifty years ago, and that such ruling was thereafter repeatedly sanctioned. The case referred to is known as the *Waukesha Case,* and was decided by this court November 17, 1855. The action was by the railway company to restrain the local authorities from collecting taxes assessed in the ordinary way during the year 1854 upon the roadbed, depot grounds, and fixtures in the town of Eagle, on the ground that such property was expressly exempted by ch. 74, Laws of 1854. The defendants demurred to the bill, principally on the ground that the act was unconstitutional. In overruling the demurrer Judge HUBBELL, before whom the cause was tried at the circuit, in his written opinion, after stating the substance of the act above quoted, uses this significant language:

"The defendants contend that under the law in question the rule of taxation is not uniform: (1) Because it establishes a rule of taxation for property belonging to companies mentioned, differing from the general rule applicable to the taxation of other property; it being a tax upon *income,* instead of a ratable tax upon *value.* (2) Because it levies a state tax, and exempts from town, county, and district taxes. (3) Because it establishes a new mode of levying taxes, dif-

fering from the general rule. . . . I am compelled to dis-
sent from all the positions taken by the defendants." 9 Wis.
434.

The plain meaning of this language is that the act in ques-
tion was not in violation of the constitutional rule of uni-
formity by exacting "a tax upon income, instead of a ratable
tax upon value," nor because it "levies a state tax, and ex-
empts from town, county, and district taxes," nor "because
it establishes a new mode of levying taxes differing from the
general rule." The whole scope of the opinion is to the effect
that such "tax upon income" was not in violation of the con-
stitutional rule of uniformity. Among other things he says,
in effect, that the act "operates as a *partial* exemption from
general taxation." 9 Wis. 433–436. True, as stated in the
opinion filed, he said: "I regard the payment to the state, not
as a tax, but as a *bonus* or *compensation* for the exemptions
granted." But he said in the same connection that "the
whole substance and effect of the law is to release those com-
panies absolutely from all ordinary taxes for ordinary pur-
poses, upon condition of an annual payment to the state."
He then answered the contention of the defendants, that the
rule of uniformity was violated because "the amount of such
tax" was "regulated by the amount of annual income," in-
stead of the "value" fixed by the "assessors," by saying:

"But all railroad and plank road companies in the state
are made subject to the same rule. It is doubtless a departure
from the general law, and amounts to a declaration that this
class of property shall have a rule by itself. . . . I have
never found a judicial decision holding that, because one
class of property paid one rate of duty and another class a
different rate, the duties were not uniform. . . . So long as
each class of property in every part of the state and under
like circumstances is subjected to the same rule, it is diffi-
cult to see how the principle of the constitution is violated;
much less how the law is so grossly and palpably wrong as to
warrant the interference of the courts, declaring it absolutely
void. . . . Under every view which I have been able to take

of this case, I cannot but regard the act of April 1, 1854 (whether its provisions be wise and equal, or otherwise), *as within the constitutional power of the legislature,* and therefore *valid."* 9 Wis. 435, 436.

I find no statement nor intimation in that opinion tending to support the proposition now advanced that the exactions prescribed by ch. 74, Laws of 1854, were not to be enforced as taxes levied upon property within the meaning of the constitutional provision quoted. That opinion was published in 3 Am. Law Reg. (May, 1855) 679–683. The syllabus recites the constitutional provision quoted and the substance of the act mentioned, and also the ruling of the court as follows :

· *"Held,* that this act was not unconstitutional, though the annual assessment on railroad companies was to be on income, instead of on property as in other cases, and though the companies were exempted thereby from town, county, and district taxes."

Judge HUBBELL was an able and learned lawyer and had previously been a member of this court under the old organization. The appeal from the order overruling the demurrer was argued for six days in this court in July, 1855 ; but the case was not decided until November 17, 1855, when, as appears from the record of this court, the "order of the court below overruling [the] demurrer to the bill [was] affirmed, with. costs." The writing of the opinion in the case fell to the lot of Mr. Justice SMITH, who was then the reporter of the court, and continued to be such reporter not only during the balance of his term, but for a year thereafter. Had the case been reported in its order it would have appeared in vol. 4 of Wisconsin Reports ; but it was never reported until Justice SMITH ceased to be a member of the court, and then only as a note to the *Knowlton Case,* in 9 Wis. 431–449. But. no opinion of the court was ever prepared by Justice SMITH, nor by any one, notwithstanding the fact that the papers in

the case were apparently retained for that purpose until February 4, 1857, when they were transmitted to the trial court. 9 Wis. 428. Had an opinion been prepared by Justice SMITH, as contemplated at the time the case was decided, yet it could not have been filed as the opinion of the court until concurred in by Chief Justice WHITON and Justice COLE, or one of them. Four years after that decision, and after Justice SMITH ceased to be a member of the court, Justice COLE, in his dissenting opinion in the *Knowlton Case,* said:

"Though no opinion has been prepared, yet the points decided were written out by one of the members of the court, and, as he informs me, placed upon file with the papers in the case. It appears that the paper containing these points has been misplaced, or cannot now be found. Still I supposed the ground of that decision was well understood throughout the state." 9 Wis. 428.

Obviously Justice COLE did not know, until so informed by Justice SMITH, that such paper had been "placed upon file with the papers in the case," and there is no evidence that Chief Justice WHITON ever knew such to be the fact. In reporting the case Justice SMITH fails to state that such paper had been placed upon file. All he said in respect to that statement is this:

"The following *paper* contains all the opinion of the court which has been written, . . . and which *has been discovered since* the opinions in *Knowlton v. Supervisors of Rock Co.* were written."

The omitted words relate wholly to the order of affirmance, which was so of record in this court and hence open to inspection.

In writing the opinion of this court in the *Knowlton Case,* DIXON, C. J., speaking of the *Waukesha Case,* 9 Wis. 431, said: "Upon examination of the records and files of the court in that case, we can find neither headnote nor opinion. As a matter of fact, we are told that none were ever written."

State v. Railway Cos. 128 Wis. 449.

9 Wis. 424. Subsequently the same chief justice stated that
the statement of points there published was obtained "from
one of the attorneys in the" *Waukesha Case* and "inserted
by the reporter." 15 Wis. 467, 468. In Justice COLE's dis-
senting opinion in that case he said, among other things:

"This court did not decide, as has been intimated, that the
law of 1854 did not impose a tax in the just and proper sense
of that term, but was a payment made to the state by the sev-
eral corporations to which the law applied in the nature of a
bonus or compensation for the exemption granted. . . . The
division of property into real, personal, and mixed, we con-
sidered a mere arbitrary division, which the legislature might
or might not regard in the imposition of taxes. The legis-
lature might adopt other classifications of property, impos-
ing the tax upon those various classifications or kinds of
property, and the rule of uniformity would be preserved, so
long as the same rule of taxation was laid upon the same
kind or class of property throughout the state, or the local
division for which the tax was raised. For instance, the leg-
islature might prescribe that all the railroad and plank road
property in the state should pay one per centum of the gross
earnings of their respective roads *in lieu of all other taxes,*
as was done by the act of 1854, and yet this law would be
valid, because it applied to all of that kind of property in this
state. It was a uniform rule upon that class of property
within the requirements of the constitution." 9 Wis. 428.

No one will question the integrity of Justice COLE, and
no one would think of doubting the accuracy of his state-
ments thus made, unless he supposed he had unmistakable
evidence to the contrary. In my judgment the language of
Justice SMITH, in the paper mentioned, is to the same effect
as the language of Justice COLE above quoted and the lan-
guage of Judge HUBBELL in deciding the case above quoted.
Justice SMITH's paper declared:

"The imposition upon railroad property by the act of 1854
does not violate that provision of the constitution of Wiscon-
sin which provides a uniform rule of taxation, *provided* like
property pertaining to railroads, or all property of that class,

*is alike taxed, or alike exempt,* as it appears to be. . . . The
state having exempted this class of property from any tax
whatever (*except the one per cent.*), which it had the right
to do, *provided* it exempted all property of the same class
uniformly, cannot be permitted to repudiate its own act and
demand a levy under the general law, from the operation of
which it had granted the exemption." 9 Wis. 449.

The plain meaning of this language is that ch. 74, Laws
of 1854, did not violate the rule of uniformity because
it prescribed a different method of taxing railroad property
from other property, since it "alike taxed or alike exempted"
all property of that class, and that by the act in question the
state had the right to exempt from taxation all that class of
property, except "a sum equal to one per centum of the gross
earnings" of the respective roads, since the act exempted all
property of the same class. In other words, it re-affirmed the
ruling of Judge HUBBELL in that case, to the effect that rail-
road property could be classified for the purposes of taxa-
tion "so long as each class of property in every part of the
state and under like circumstances is subjected to the same
rule," and hence that railroad property could be classified
by itself without violating the rule of uniformity. That was
intended to answer the contention of Mr. Ryan to the con-
trary under the second head of his brief. 9 Wis. 439–444.

Having thus solemnly held, in effect, that under the con-
stitution the legislature had power to prescribe the property
upon which taxes should be levied and to classify such prop-
erty for the purposes of taxation, and to put all railway prop-
erty into a class by itself, and to enforce payment of exac-
tions made on account of the same in the manner prescribed,
it is difficult to understand how the same court in the same
action could consistently hold that ch. 74, Laws of 1854, did
not provide for imposing "a tax on railroad property, or a
tax at all, within the meaning of sec. 1, art. VIII, of the con-
stitution." Certainly no such inconsistency should be at-
tributed to the decision of November 17, 1855, unless the

evidence is unquestionable. I find no such evidence in Justice Smith's paper. The balance of that paper not quoted above reads as follows:

"If the act of 1854, having relation to this class of property, was not passed in a constitutional manner, as it is claimed .appears by the *records or journals of the legislature,* so, by like evidence, it would seem that the law by which the board of supervisors attempted to assess this property was unconstitutionally passed; and, admitting the premises, the injunction is proper, the bill covering such a case. But the court do not think *the law of 1854* does *impose* a tax within the meaning of the constitutional *provisions,* and therefore the law of 1854 is valid, so far, at least, as the government is concerned." 9 Wis. 449.

Manifestly, the first portion of this quotation has no reference to the rule of uniformity prescribed by sec. 1, art. VIII, of the constitution, but relates entirely to the first point made in the brief of Mr. Ryan, to the effect that ch. 74, Laws of 1854, was a "law which imposed a tax," but was not passed by a yea and nay vote entered upon the journals of the legislature, as prescribed by sec. 8, art. VIII, of the constitution. 9 Wis. 436–439. According to the paper the court assumed that if it so appeared "by the records or journals of the legislature," as claimed by Mr. Ryan in support of his demurrer, then it also appeared "by like evidence . . . that the law by which the board of supervisors attempted to assess this property was unconstitutionally passed," and hence no justification to the defendants. The only possible ground for an inference in support of the proposition advanced is the use of the word "provisions" in the next clause of the quotation, or rather the use of the letter "s" at the end of that word, making it plural instead of singular. The language of that clause is significant. The word "but," at the beginning, indicates a continuance of the answer to Mr. Ryan's contention that the act mentioned was never passed by a yea and nay vote entered upon the jour-

nals, as required by sec. 8, art. VIII, of the constitution; and the words *"the law of 1854 does impose a tax"* relate to what is said in that section, and not to anything said in sec. 1, art. VIII, of the constitution. That had been fully covered in the other portion of Justice SMITH's paper above quoted. Certainly, there is a broad distinction between a law imposing a tax and a statute prescribing a method of levying a tax upon property, or making an exaction in lieu of a tax on property.

In view of the language of that paper, and the facts stated, and what was said by Justice COLE, it is very clear to my mind that this court, in the case referred to, decided four propositions November 17, 1855, to the effect: (1) Ch. 74, Laws of 1854, did not impose a tax within the meaning of sec. 8, art. VIII, of the constitution, which required the vote thereon to be taken by yeas and nays and entered on the journal. (2) If it did, it also appeared by like evidence that the statute under which a general assessment of this same property was assessed by the defendants was not passed by such yea and nay vote, and hence was no justification for the defendants. (3) Under sec. 1, art. VIII, of the constitution, the legislature had the power to prescribe the property upon which taxes should be levied, and to classify such property for the purposes of taxation, and to put all railway property in a class by itself, and to enforce payment of exactions made in the manner prescribed in the act mentioned. (4) That act did not violate the rule of uniformity by prescribing a different method and rate of taxing railroad property from other property, since the exaction in lieu of taxation and the exemption therein made applied alike to all that class of property throughout the state.

The question recurs whether such power to classify property for the purposes of taxation and to make exactions in lieu of taxation has since been permanently negatived by the decisions of this court. It must be admitted that November 9,

1859, and several months after Chief Justice WHITON and Justice SMITH had ceased to be members of this court, and against the judgment of Justice COLE, this court, in an opinion written by Chief Justice DIXON, concurred in by Justice PAINE, constituting a majority, brushed aside the decision of November 17, 1855, with the remarks that "upon examination" they found "neither headnote nor opinion" among "the records and files of the court in that case," and had been "told that none were ever written," and that "from the best information" they had obtained they had learned "that it was determined by the court that no question of the exercise of the taxing power was involved in it." *Knowlton v. Rock Co.* 9 Wis. 410, 424. In that case the opinion of the court (with Justice COLE dissenting) declared that sec. 1, art. VIII, of the constitution prohibited the legislature from classifying property for the purposes of taxation and then taxing one class at a different rate than another class. Among other things it is there said:

"'The rule of taxation shall be uniform;' that is to say, the course or mode of proceeding in levying or laying taxes shall be uniform. It shall in all cases be alike. The act of levying a tax on property consists of several distinct steps, such as the assessment or fixing of its value, the establishing of the rate, etc.; and, in order to have the rule or course of proceeding uniform, each step taken must be uniform. The valuation must be uniform, the rate must be uniform." 9 Wis. 420, 421.

January 4, 1860, two cases were decided by this court in which that case was approved so far as deemed applicable, both relating to special assessments, which were held to be an exercise of the taxing power and limited by sec. 1, art. VIII, of the constitution, as modified by sec. 3, art. XI, of the constitution. *Weeks v. Milwaukee,* 10 Wis. 242, 270 (see p. 262); *Lumsden v. Cross,* 10 Wis. 282, 289 (see p. 284). In this last case it was expressly held that "all taxes levied for the purpose of revenue and for the support of the gov-

ernment, as well for the expenses of municipal corporations as for the state at large, must be levied in accordance with the uniform rule prescribed by sec. 1, art. VIII, of the constitution."

The case of *State ex rel. Att'y Gen. v. Winnebago L. & F. R. P. R. Co.* 11 Wis. 35, came before this court on the return to the alternative writ of *mandamus* to compel the plank road company to pay to the treasurer of the state $70,000, being a sum equal to one per centum of its gross earnings for two years, and which it had failed and neglected to make return to the state treasurer and pay, as required by law. Ch. 74, Laws of 1854; secs. 182, 183, ch. 18, R. S. 1858. The company moved to quash the writ on the sole ground that the statutes cited were in violation of the constitutional provision which declares that "the rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall prescribe." Sec. 1, art. VIII. The case presented for consideration the same questions involved in the case decided November 17, 1855. Both cases arose under the same statutes, the only difference being that the former action was brought by the railway company and the latter action was against the plank road company. The opinion of the majority of the court was written by Justice PAINE, and, as his opinions usually were, in language too plain to be misunderstood. After speaking of the uncertainty of the points decided in the *Waukesha Case,* 9 Wis. 431, and that it was "common for all courts to review their own decisions," he declared that, "in view of its peculiar circumstances," he deemed it "eminently proper [for that case] to be *reconsidered.*" He then said that if it was decided in that case "that the law taxing rail and plank road companies" was "a compliance with the constitutional requirement of a uniform rule, it was in this respect overruled by" the *Knowlton Case.* Then, after reconsidering and rediscussing the question, the majority of the court, adhering to the rule as stated in the *Knowlton Case,*

held that the legislature had no power to divide property into
different classes, preserving equality in each class though fix-
ing a different rate in the different classes, but that, on the
·contrary, the rule of taxation must be general, and applicable
to all taxable property alike, and that the rule of uniformity
"was designed to secure equality in the burden as between
the different kinds of taxable property." 11 Wis. 35, 38–42.
The opinion then states that "the only remaining question is
whether the imposition upon the plank road company is a tax
within the meaning of the constitution." 11 Wis. 42. It then
answers the several attempts of counsel to distinguish it from
a tax, to the effect that, although assessment on valuation was
the usual and general mode of imposing a tax, yet that it
was not essential; that the "difference in the mode would not
prevent its being a tax;" that there was "certainly no room
for the pretense that this is [was] a bonus for the granting
of the charter;" that there was no ground for claiming "that
the bonus was a mere proposal or offer of a bargain or con-
tract," since "the tax was absolute and imperative, leaving
nothing to the discretion of the taxpayer." It is then said,
in effect, that the exaction cannot be maintained as a license,
which is an "authority granted to do that which the licensee
might not legally do without it." The opinion continues:

"We have no idea that the provision of the constitution
requiring the rule of taxation to be uniform was designed to,
or does, impose any restriction on the police power of the
legislature in granting licenses for anything that may in its
nature be the subject matter of a license. But we do not think
they could license the owners of a particular class of property
to be exempt from the payment of full taxes on the payment
·of a less sum. That would obviously be no exercise of the
police power, but could only be resorted to as a mere evasion
·of the constitutional rule of uniformity, and that is the only
kind of a license into which this act taxing rail or plank roads
can by any possibility be construed. It is not a license to
exercise the rights granted by their charters, for that right
the charters themselves give, and this act does not profess to

give. It grants only the right to be exempt from all other taxation on the payment of a specific tax of one per centum of their gross earnings. The legislature did not call this a license, but honestly called it a tax, *as it is beyond all question."* 11 Wis. 45.

Justice Cole dissented from the proposition that the legislature had no power to classify property for the purposes of taxation, and then to tax one class at a different rate than another; but he never dissented from the proposition that the exaction of a sum equal to one per centum of the gross earnings of rail and plank road companies was a tax within the meaning of the uniformity clause of the constitution. On the contrary, he always contended that it was a tax, and a valid tax, on all that class of property. So it appears that March 6, 1860, this court in that decision unanimously held that such exaction upon such gross receipts was a tax on the property of such companies, within the meaning of sec. 1, art. VIII, of the constitution—a proposition which does not seem to find favor at the present time.

Sixteen days after the announcement of that decision, and on March 22, 1860, the governor of this state approved of two bills which had just before passed the legislature. One was entitled "An act exempting certain property therein named from taxation," and declared:

"The track, right of way, depot grounds, and buildings, machine shops, rolling stock, and all other property, necessarily used in operating any railroad in this state, belonging to any railroad company, are hereby, all and singular, declared to be, and they shall henceforth remain, *exempt from taxation,* for any purpose whatever, and it shall not be lawful to assess or impose taxes upon any property before named." Ch. 173, Laws of 1860.

Such exemption was subject to a proviso as to special assessments and taxes on property not connected with such roads, and excepting therefrom railroads operated by horse

power.   The other was entitled "An act regulating railroads."
The first section declared:

"All railroad companies now organized, or that may here-
after be organized, in this state, and having a railroad com-
pleted, in whole, or in part, and being operated or used, shall
hereafter be compelled to apply for, and obtain, in the man-
ner hereinafter directed, a license for the operating of their
respective roads, and to pay for such license, to the treasurer
of the state, as a fee or charge therefor, a sum equal to one
per centum of the gross earnings of their respective roads."
Ch. 174, Laws of 1860.

Secs. 2 and 4 fixed the time for making return to the state
treasurer of the amount of such gross earnings, and applying
for such license and paying for the same, substantially as pre-
scribed in secs. 182, 183, ch. 18, R. S. 1858, as amended by
ch. 140, Laws of 1859, omitting therefrom plank road com-
panies.   Sec. 3 prescribed a penalty and forfeiture for any
failure to comply with the act, with a proviso.   Sec. 5 re-
pealed secs. 183, 186, ch. 18, R. S. 1858; and sec. 6 excepted
from the act railroads operated by horse power.

These two acts were not only pending at the same time
and approved by the governor on the same day, but they
appear on their face to have one common purpose, as com-
plements of each other.   With some change of phraseology
and omitting the provisions in respect to plank roads, they
were, together, in substance the same as the prior statutes
above considered (ch. 74, Laws of 1854; secs. 182–186, ch. 18,
R. S. 1858).   Horse railroads are expressly excepted from
each, and neither applied to plank road companies.   The one
exempts from taxation such property of the railway compa-
nies as is used in operating the respective railroads for which
the license is granted, leaving all lands owned by such com-
panies, not adjoining the track, subject to all ordinary taxes.
The sole purpose of the two acts together was to secure from
the respective railroad companies, each year, "a sum equal

to one per centum of the gross earnings of such road." While
the one was entitled "An act regulating railroads," yet it con-
tained no regulation nor attempt at regulation. The only
object of the two enactments was to secure for the use of the
state the revenue mentioned. The exaction of such percent-
age of the gross earnings of the property so exempted, though
in form "as a fee or charge" to be paid "for a license for the
operating of their respective roads," was nevertheless essen-
tially an annual tax on the respective companies for the
amount stated, in consideration of such exemptions. While
that act was, undoubtedly, inspired by previous rulings of
this court, yet it is true that sixteen days before that enact-
ment Justice PAINE, with DIXON, C. J., concurring, de-
clared, in the language above more fully quoted, that such
exaction by way of license issued under the circumstances
mentioned "could only be resorted to as a mere evasion of the
constitutional rule of uniformity." 11 Wis. 45.

The *Kneeland Case* was decided after that enactment, but
was based upon facts existing prior to the enactment. It was
brought to restrain the issuing of tax deeds on Kneeland's
property, which had been sold for taxes for the years 1858–59,
on the ground that the assessors had knowingly and inten-
tionally omitted to assess the property of railroad companies
of the value of $500,000. The city justified such omission
under ch. 74, Laws of 1854, and sec. 183, ch. 18, R. S. 1858,
and the trial court held in favor of the city and dismissed
the complaint, and Kneeland appealed to this court; and
upon the first hearing the judgment was reversed and the
cause remanded with direction to enter judgment in favor
of the plaintiff. 15 Wis. 454–466. In writing the opinion
of this court, in reaching such conclusion, Justice PAINE
starts out with the statement that in the case of *State ex rel.*
*Att'y Gen. v. Winnebago L. & F. R. P. R. Co.* 11 Wis. 35,
"this court decided that the law which attempted to make
railroads and plank roads *taxable by a different rule* from

that applicable to the general mass of taxable property was unconstitutional." This was said on the theory that the exactions made from such companies by the statutes just cited were necessarily taxes upon property within the meaning of sec. 1, art. VIII, of the constitution, and there is no intimation in that opinion that such exactions were not such taxes. 15 Wis. 458–466. The only hesitancy expressed in holding the act, so taxing railroads by a different rule than other property, to be invalid, was the fact that in the *Waukesha Case,* 9 Wis. 431, the same act had "been once declared valid by this court." 15 Wis. 461. In view of that decision, and the fact that the departure therefrom had resulted in invalidating all the taxes in counties where railroad property was located, the court was urged to retrace its steps and "hold the law taxing railroads to have been constitutional." 15 Wis. 462. But the court finally concluded "that the consequences of going *backward*" might, "after all, be more disastrous than those of going forward." The opinion then states the point at issue and the result of going backward in this unmistakable language:

"But, if we go backward, we must say that particular classes of property may be taxed at less rates than others, and that the legislature may make whatever discrimination they please in the rates of taxation, provided only that each class is taxed alike." 15 Wis. 463.

On a motion for a rehearing being made the same was granted, and opinions filed thereon by DIXON, C. J., and Justice PAINE. 15 Wis. 467–474. The gravity of the situation sufficiently appears in those opinions. Among other things, DIXON, C. J., said:

"The interests involved are immense, and the consequences of adhering to our late decision beyond calculation. The taxes for a series of years in a great state like this cannot be annulled, and every proceeding connected with and depending upon them overturned, without a shock which must be felt by every property owner and citizen of the state." 15 Wis.

468. "I do not see how the errors of the past are to be corrected, except by the levy of a new tax to make up all former deficiencies. I have tried to persuade myself that a reassessment and relevy of the taxes for those years was practicable, *but I am satisfied it is not.*" 15 Wis. 469. "It seems to me that, as to the particular species of property in question before the court in 1855, I must return to the rule then established." 15 Wis. 469. "As I have before said, my mind is in great perplexity and doubt, but upon the whole I can see no other way than to go back to the rule established by the court in 1855." 15 Wis. 471.

The opinion of Justice PAINE on that motion is equally significant. Among other things he said:

"I have become satisfied that, if we adhere to the decision already announced in this case, it will invalidate not only the taxes in those counties where there was rail and plank road property, but also the entire taxes of the state; for the omission of that property in the counties where it was located necessarily disturbs the proportions as between them and the other counties in the state equalization. Another case has also been argued, in which it was claimed that the principles of our decision must also *invalidate the laws of 1860,* professing to exempt railroads entirely, and then requiring them to pay a license. It is said that this is in substance the same thing as the law of 1854 under another name. *And I am satisfied also that this is so.* We cannot, while adhering to our 1860, unless we are prepared to say that the legislature may decision in the" *Plank Road Case,* "sustain this legislation of do that indirectly which it cannot do directly; that it may, by merely calling things by wrong names, sustain the most palpable evasion of a constitutional provision." 15 Wis. 472.

Then, after reiterating his conviction "that a rule taxing different kinds of property at different rates is not a uniform rule," he declared it to be his "duty to return to and follow, though" he could not defend, the *Waukesha Case,* 9 Wis. 431; that, notwithstanding the uncertainty as to the decision in that case, it was known "that upon some ground" the court "sustained the law of 1854," and "that all the taxation of the state and all the private transactions growing out of it"

had "since been conducted on the theory of its validity," and
hence that that decision should be regarded as imperative au-
thority and the decision in the *Plank Road Case,* 11 Wis. 35,
overruled.  15 Wis. 473, 474.  After the case had been re-
argued Justice PAINE wrote another opinion on behalf of
the court, and in doing so stated that ordinarily he would con-
tent himself "without adding anything to the opinions" he
had "already filed in the case," but in view of the fact that
"the positive conviction, stated in granting" the rehearing,
that it was the duty of the court to retrace its steps and follow
the *Waukesha Case,* had "been assailed by eminent counsel,"
he briefly stated the reasons for adhering to such convictions.
15 Wis. 692.  The opinion then discusses at some length the
maxim *stare decisis* on the assumption "that there was a de-
cision of this court sustaining the validity of the law of 1854
*taxing rail and plank roads.*"  15 Wis. 692, 695.  The opin-
ion then answered the contention that no such assumption
could be indulged, "based entirely upon the fact that no writ-
ten opinion was filed in the *Waukesha Case* as the statute re-
quired."  The opinion then states that Justices SMITH and
COLE

"both agree that the court decided that the act of 1854 was
not a violation of the constitution.  We get this from a writ-
ten statement of the points decided, made soon after the de-
cision, by the judge then acting as reporter, and to whom the
duty was assigned of writing the opinion, which statement
was sent to one of the counsel in the case for his informa-
tion; and from the statements of Mr. Justice COLE, now on
the bench. . . . The only discrepancy is that the statement
of Justice SMITH shows that the court did not think that the
law of 1854 imposed 'a tax within the meaning of the con-
stitutional provisions,' while Justice COLE states that they
did 'not decide that it did not impose a tax,' etc.  But the
difference is wholly immaterial, inasmuch as both statements
show the court held that, even if it was a tax, it was no viola-
tion of the rule of uniformity.  Both show that the law was
decided to be no violation of the constitution."  15 Wis. 695.

State v. Railway Cos. 128 Wis. 449.

Dixon, C. J., had already stated "that no opinion or state-
ment of the points decided . . . was ever placed upon the
files of this court," but that such statement "was afterwards
·obtained . . . from one of the attorneys in the former case
and inserted by the reporter." 15 Wis. 467.

Obviously, neither Dixon, C. J., nor Justice Paine had
much faith in the claim based upon the word "provisions,"
contained in one clause of the statement, to the effect that the
act of 1854 did not impose a tax on property, within the
meaning of the uniformity clause of the constitution, espe-
cially against the. statement of Justice Cole, above quoted,
that no such decision was made. This is manifest from the
fact that each of the several opinions of Judges Dixon and
Paine, mentioned, was made to turn upon the power of the
legislature to classify property for the purposes of taxation
and then to tax each class at a different rate. Thus, Justice
Paine in the *Kneeland Case* said in behalf of the court:

"But, if we go backward, we must say that particular
·classes of property may be taxed at less rates than others, and
that the legislature may make whatever discrimination they
please in the rates of taxation, provided only that each class
is taxed alike." 15 Wis. 463.

Since the court did "go backward" and affirm the judg-
ment, instead of reversing it, the court necessarily sanctioned
the legislative power of classification and discrimination so
far as taxing rail or plank roads was concerned. Certainly
·Justice Paine did not intend to go back to an assertion of
Justice Smith which he deemed "wholly immaterial." That
is made plain in another case in the same volume, where this
·court refused to overrule the *Knowlton Case,* but expressed
itself as being bound by the decision in the *Waukesha Case,*
and then declared: "But we shall follow that decision no fur-
ther than the exact point decided; that is, to sustain the valid-
ity of the act of 1854 *taxing rail or plank roads." Knowl-
ton v. Rock Co.* 15 Wis. 600, 601.

The ruling in the *Kneeland Case* "as to the constitutionality of the law *taxing railroad companies a per cent.* upon their gross earnings" was affirmed in *Dean v. Gleason,* 16 Wis. 1.     The history of such adjudications was partially stated in *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 64–77. As stated by Justice PAINE in the *Kneeland Case,* "the laws of 1860" (chs. 173, 174, Laws of 1860) "professing to exempt railroads entirely, and then requiring them to pay a license," were "in substance the same thing as the law of 1854 under another name."     As already indicated, those two chapters together constituted a single plan or scheme for taxing railroads.     With some slight changes, increasing the percentage and otherwise, they were continued in the Revisions of 1878 and 1898, and down to the *ad valorem* enactment. This is, in effect, conceded in the opinion filed.     True, the substance of ch. 173, Laws of 1860, was placed in the section exempting property from taxation (subd. 14, sec. 1038, R. S. 1878, and Stats. 1898) ; and the substances of ch. 174, Laws of 1860, exacting a percentage on gross earnings, were placed in the chapter on the "Taxation of Railroads" (secs. 1211– 1214, R. S. 1878, and Stats. 1898).     But, nevertheless, the two chapters are still to be regarded as together constituting the same scheme or plan for taxing railroads.     They were complements of each other, and no legislature would grant the exemption without some exaction.     Thus it was held by this court, in an opinion written by DIXON, C. J., that "the payment of this sum into the state treasury, and which is called license money, must, in the light of past legislation upon the subject, be regarded as, in the judgment of the legislature, an equivalent for the taxes which those companies would otherwise be required to pay, if assessed and taxed according to the ordinary method prescribed by law."     *Milwaukee & St. P. R. Co. v. Crawford Co.* 29 Wis. 116, 123, 124; *Milwaukee & St. P. R. Co. v. Milwaukee,* 34 Wis. 271, 277, 278.     In this last case it was held that "the statute is to be fairly and

liberally construed in favor of the railroad companies, which
do not receive such exemptions as a bonus, but are required
to pay into the state treasury an equivalent for taxes in the
shape of a license." In a later case, construing the sections
of the Statutes last cited, it was held that "statutes imposing
license fees, which are to all intents and purposes taxes, should
be governed by the same rules of construction as those impos-
ing taxes *eo nomine." State ex rel. Abbot v. McFetridge,* 64
Wis. 130, 140, 24 N. W. 140. The court there said: The stat-
utes "impose involuntary burdens for revenue purposes upon
those who operate railroads. These impositions are called
license fees, but in their objects and effects they are in the
nature of taxes. Manifestly, the same rules which prevail in
the construction of statutes imposing taxes *eo nomine* should
be applied to statutes imposing such license fees."

In view of the adjudications of this court above cited, I
would not feel at liberty to hold that the legislature had no
power to place railroad property in a class by itself for the
purposes of taxation and to tax the same at a different rate
and by a different method than other property, even were I
to concede, as an original proposition, the correctness of the
ruling in the *Knowlton Case* and the *Plank Road Case*—
much less to hold that a tax upon the gross earnings of rail-
way companies was not a tax on property within the meaning
of the uniformity clause of the constitution. But I do not
concede such rulings to have been correct. In an opinion
written more than a quarter of a century ago, concurred in by
Chief Justice COLE and Justices LYON and TAYLOR, the
writer pointed out the fact that the uniformity clause of our
constitution did not contain the word "equal" or "value," or
the equivalent of either of those words, like other constitu-
tions cited. *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 37, 60–
88, 8 N. W. 821; *Bacon v. Board of State Tax Comm'rs,* 126
Mich. 22, 85 N. W. 307, 60 L. R. A. 361, 363, note. And
so the conclusion was there reached that, in the absence of

such restrictive words in that clause of our constitution, the words "the rule of taxation shall be uniform" should not be construed as including the word "equality" or "value," or the equivalent of either. And so it was there said that that clause in our constitution

"simply requires that 'the rule of taxation shall be uniform.' But who makes the rule which is thus to be uniform? Was it made by the constitutional convention, or was it left for the legislature? Most of the constitutions referred to, where the word 'uniform' has been used, have directly or indirectly applied it to property named therein, or valuation, or rate, or taxes, or classes of subjects; but in our constitution it applies to none of those things, but simply to the 'rule' of taxation.' What is this rule of taxation? Manifestly, it is the act of levying a tax, or imposing taxes, on the subjects of the state by the legislative power of the state. It is the measure of individual duty in support of the public burdens, and the means of enforcing the same. The rule of taxation is the law of taxation. Such rule or law must be prescribed by the legislature, as well as the property to which it is to be made applicable. But the uniformity does not go directly to the property so prescribed, but only to the 'rule' or law by which contributions are enforced against the owners of such property. The uniformity reaches the property so designated by the legislature, but only through the 'rule' or law prescribed. As the uniformity could through the rule or law only reach such property as the legislature should designate as being subject to taxation, it is very evident that it never could reach property not so designated, and therefore exempt from taxation, and hence to which the rule could not apply. The legislature has the exclusive power to designate the property which shall be subject to taxation, and to prescribe a rule or law by which the owners of such property are forced to contribute to the public burdens, limited only by the requirement that the rule so prescribed shall be uniform. Uniformity of rule is entirely different from uniformity of subjects to which the rule is applicable. Most general laws are uniform rules, but the diversities in the subjects to which they apply are innumerable. In determining just what the rule of uniformity shall be in taxation, and how it shall be applied, there is a wide

field for legislative discretion. Of course, it could be applied to rate or valuation, or mode or manner of assessment or collection, or all exemptions might be repealed or greatly modified; and so it could be applied to all property, or to certain subjects, or to certain classes, kinds, or species of property. The denial of the power of the legislature to determine and fix 'the rule of taxation,' subject to the limitation of uniformity, and the attempt to engraft it upon the constitution itself, as had been done by apt words in other constitutions, has led to much diversity of opinion, if not confusion of terms.". 52 Wis. 93, 94.

This certainly was in conflict with the conclusion reached in the *Knowlton Case* and the *Plank Road Case,* where, although it was conceded to apply to the "course or mode of proceeding in levying or laying taxes," yet it was also said that such

"course or mode of proceeding . . . shall in all cases be alike. The act of laying a tax on property consists of several distinct steps, such as the assessment or fixing of its value, the establishing of the rate, etc.; and, in order to have the rule or course of proceeding uniform, each step taken must be uniform. The valuation must be uniform. The rate must be uniform. Thus uniformity in such a proceeding becomes equality; and there can be no uniform rule which is not at the same time an equal rule, operating alike upon all the taxable property throughout the territorial limits of the state, municipality, or local subdivision of the government, within and for which the tax is to be raised." 9 Wis. 420, 421.

If the construction thus given to the clause of the constitution in question is now to prevail, if "the course or mode of proceeding in levying and laying taxes" must "in all cases be alike," if the "several distinct steps" in such proceedings "must be uniform," then I am unable to perceive upon what principle the validity of ch. 315, Laws of 1903, can be sustained, since it provides only "for the taxation of railroad companies," with a different method of assessment and a different method of valuation and fixing the rate than of other

property, and other differences unnecessary to mention. But, as I read the decisions of this court, such construction so announced in the *Knowlton Case* and sanctioned in the *Plank Road Case* was expressly departed from in the final adjudication in the *Kneeland Case,* and subsequently. Thus it was held long ago that "the mode of levying, assessing, and collecting taxes is entirely subject to the discretion of the legislature, limited by the constitutional provision which requires the rule of taxation to be uniform." *Smith v. Cleveland,* 17 Wis. 556, 565. Chief Justice Dixon, speaking for the court, there said:

"The machinery of taxation, the mode of levying, assessing, and collecting, is subject entirely to its discretion. The liability to taxation and nonpayment of the taxes being admitted, the legislature may, as to all other things, declare what shall or shall not be essential to the validity of the proceedings. The same power which imposes a duty may dispense with its performance."

So the court held, in an opinion by the same chief justice, that "the legislature has power to prescribe the forms of tax proceedings, and in matters of form may declare what steps shall or shall not be essential to the validity of a tax sale or tax deed." *Smith v. Smith,* 19 Wis. 615. But it is unnecessary to further cite authorities on that question, since it is expressly held in the *ad valorem* case decided herewith that it "is within the legislative discretion to place railway corporations in a class by themselves," as is done by the act in question. Not only that, but it is there expressly held that "the classification of mortgage indebtedness is legitimate under the doctrine of classification" therein stated. So it is held in that case that "the legislature may classify and subclassify property, to the extent of distinguishing differences as to a particular class or subclass, reasonably requiring special treatment to promote the constitutional requirement." The placing of railroad corporations in a class by themselves for the

purposes of taxation was just as legitimate under the license system as under the *ad valorem* system. See *Chicago & N. W. R. Co. v. State, post,* p. 553, 108 N. W. 557.

I am unable to perceive any logical basis for the proposition now advanced that the exactions made by law of "four per centum," or any other "per centum, of the gross earnings of all railroads," were not taxes upon property within the meaning of sec. 1, art. VIII, of the constitution. There can be no question but that such earnings were property. This court has recently held that notes and mortgages—"things in action and evidences of debt"—were "property" within the meaning of that clause of the constitution, and hence were subject to taxation under that clause. *Kingsley v. Merrill,* 122 Wis. 185, 190, 194, 99 N. W. 1044. Since the gross earnings of every railroad must necessarily be property belonging to such corporation, the only remaining question for consideration is whether the exactions so made in lieu or consideration of such exemption from ordinary taxation were "taxes . . . levied upon such property" within the meaning of that clause of the constitution. In determining that question it is immaterial whether there was a contractual relation between the state and the railroad companies or not. It is conceded in the opinion filed that they were "taxes in the just and proper sense of the term," for the purposes of revenue; but it is said that they were not "taxes on property within the meaning of the constitution." Since such exactions of the percentage of such gross earnings were "taxes in the just and proper sense of the term," it is difficult to conceive why they were not taxes on property within the meaning of the constitution. Certainly no marked distinction has heretofore been pointed out. Such distinction cannot be satisfactorily made upon the theory of inclusion and exclusion. The necessity for having some fixed standard to determine such differences seems to have been realized, and so in the *ad valorem* case, herewith decided, and above cited (*post,*

p. 553), it is, as I understand, in effect held that "the rule of uniformity" prescribed by the constitution only applies to "direct taxation on property," and that as to such property the "legislature may classify and subclassify property." The difficulty about such conclusion is that the constitution does not so read. It simply declares that "taxes shall be levied upon such property as the legislature shall prescribe" by a uniform rule. The language is sweeping and is broad enough to cover all "taxes in the just and proper sense of the term." It is not confined to "direct taxation" nor direct taxes. Even if it were, the proposition advanced could not, in my judgment, be maintained, for the simple reason that a tax upon the "gross earnings" of a railroad company is just as much a direct tax on that portion of the company's property as though it had been upon the roadbed, or rolling stock, or any personal property. Since a tax on "things in action and evidences of debt" has been held to be a tax on property within the meaning of the constitution (*Kingsley v. Merrill*, 122 Wis. 185, 99 N. W. 1044), it would seem to follow that a tax on gross earnings of railroad companies is a tax on property within the meaning of the same clause of the constitution. This must be so, unless such "gross earnings" are not to be regarded as property, since the mode of making such exactions for the purposes of revenue is purely a matter of legislative discretion.

But we are not without direct authority on the question. Under the constitution of the United States "direct taxes" are required to "be apportioned among the several states, . . . according to their respective numbers," or inhabitants. Sec. 2, art. I, Const. of U. S. But indirect taxes, such as "duties, imposts, and excises," are required to "be uniform throughout the United States." Sec. 8, art. I, Const. of U. S. Under such provisions it was always conceded that taxes on land were "direct taxes." After elaborate arguments and careful deliberation it was held, under such constitu-

tional provisions, by the supreme court of the United States, that "a tax on the rents or income of real estate" was a "direct tax," and, not having been so apportioned, was void. *Pollock v. Farmers' L. & T. Co.* 157 U. S. 429, 15 Sup. Ct. 673. Such rulings were affirmed on re-argument. 158 U. S. 601, 15 Sup. Ct. 912. The court in the same case then decided that "taxes on personal property or the income of personal property" were "direct taxes." Id. In a later case the same court held that "a stamp tax on a foreign bill of lading is, in substance and effect, equivalent to a tax on the articles included in that bill of lading, and therefore is a tax or duty on exports." *Fairbank v. U. S.* 181 U. S. 283, 21 Sup. Ct. 648. Since taxes on the income of real and personal property are direct taxes on property, there would seem to be no escape from the conclusion that taxes on the income of railway companies, consisting of gross earnings, are also direct taxes.

It is sought to bring the case within the rule applicable to "duties, imposts, and excises," or mere privileges, and so cases are cited where foreign insurance companies or other foreign corporations have been licensed to do business in the state. Numerous decisions of that kind have been made by that court, and no one disputes the proposition. The case apparently most relied upon is *Maine v. Grand Trunk R. Co.* 142 U. S. 217, 12 Sup. Ct. 121. The defendant was a corporation created under the laws of Canada, having its principal place of business at Montreal. The action was brought by the state to recover "an *excise tax* upon the defendant . . . for the privilege of exercising its franchises within the state," under a statute which declared:

"Sec. 1. The buildings of every railroad corporation or association whether within or without the located right of way, and its lands and fixtures outside of its located right of way, shall be subject to taxation by the several cities and towns in which such buildings, land and fixtures may be situated, as other property is taxed therein.

"Sec. 2. Every corporation, person or association, operat-

ing any railroad in this state, shall pay to the state treasurer, for the use of the state, *an annual excise tax* for the privilege of exercising its franchises in this state, which, *with the tax provided for in section one,* shall be in lieu of all taxes upon such railroad, its property and stock."

It will be observed that such *"excise tax"* was in addition to the taxes upon the property of the corporation in the towns and cities where it was located. The question for determination was whether such state statute was a regulation of interstate and foreign commerce. The trial court held that it was, and adjudged accordingly. That judgment was reversed on the ground that such statute was not a regulation of such commerce, but, in the language of the act, "an annual *excise tax.*" Mr. Justice FIELD, speaking for the court, distinguished that case from an earlier case where the tax was "in terms upon the gross receipts of" the corporation. *Phila. & S. S. Co. v. Pennsylvania,* 122 U. S. 326, 7 Sup. Ct. 1118. Justices BRADLEY, HARLAN, LAMAR, and BROWN dissented on the ground that the act was a regulation of interstate commerce. It had long before been well settled by that court that the right of such Canada corporation to do business in the state of Maine depended solely upon the will of that state. *Hooper v. California,* 155 U. S. 648, 652, 15 Sup. Ct. 207, and numerous cases there cited. In this last volume that same court held that, without infringing the interstate commerce clause of the federal constitution, a state might impose taxes upon foreign corporations engaged in such commerce, "graduated according to the amount and value of the companies' property measured by miles, and being in lieu of taxes directly levied on the property," and that the same was "a tax which" was "within the power of the state to impose." *Postal Tel. C. Co. v. Adams,* 155 U. S. 688, 696–698, 15 Sup. Ct. 268. It was there said by the court that "doubtless no state could add to the taxation of property according to the rule of ordinary property taxation, the burden of a license or

other tax on the privilege of using, constructing, or operating an instrumentality of interstate or international commerce or for the carrying on of such commerce; but the value of property results from the use to which it is put and varies with the profitableness of that use, and by whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property or a just equivalent therefor, ascertained by reference thereto, it is not open to attack as inconsistent with the constitution." See, also, *Atlantic & P. Tel. Co. v. Philadelphia,* 190 U. S. 165, 23 Sup. Ct. 817. In a later case in that court, where the facts were similar to the case at bar, the local statute required the railway company to pay a "percentage on gross earnings as provided for therein," in lieu of all other taxes; and the question was whether such statute was a regulation of interstate and foreign commerce, and it was held to be taxation of the lands of the company, through the payment of such percentage, and it was said in the unanimous opinion of the court:

"But there is great force in the claim that the act is not subject to the objections mentioned in" *Fargo v. Michigan,* 121 U. S. 230, 244, 7 Sup. Ct. 857; *Philadelphia & S. S. Co. v. Pennsylvania,* 122 U. S. 326, 7 Sup. Ct. 1118, "and the cases therein referred to. In those cases there was a distinct tax upon the gross earnings without reference to any other tax, and not in substitution or in lieu of another tax, while in this case the act plainly substitutes *a different method of taxation* upon the property of a railroad company. It is a tax upon the lands and all the other property of the company, but instead of placing a valuation upon the lands and other property, and apportioning a certain amount upon such valuation directly, as was the old method, a new one is established of *taking a percentage upon the gross earnings* as a fair substitute for the former taxes upon all the lands and property of the company, and when it is said, as it is in this act, that the tax collected by this method shall be in lieu of all other taxes whatever, it would seem that it might be claimed with great plausibility that a tax levied under such circumstances and by such methods was not in reality a tax upon the gross

earnings, but *was a tax upon the lands and other property of the company,* and that the method adopted of arriving at the sum which the company should pay as taxes upon its property was by taking a percentage of its gross earnings." *McHenry v. Alford,* 168 U. S. 651, 670, 671, 18 Sup. Ct. 242. See *Mich. Cent. R. Co. v. Powers,* 201 U. S. 245, 26 Sup. Ct. 459.

But it is unnecessary to multiply authorities. As indicated, the license system of taxing railways, so called, which was in force in this state during the fifty years immediately preceding the present *ad valorem* system, included the exemption from taxation of "the track, right of way, depot grounds and buildings, machine shops, rolling stock, and all other property necessarily used in operating any railroad in this state, belonging to any railroad company;" and the exaction, in lieu and consideration thereof, of a "per centum of the gross earnings" of all such railroads. Subd. 14, sec. 1038, R. S. 1878, and Stats. 1898, and secs. 1211–1214 of the same Statutes. No one would claim that any legislature would grant such exemption as an independent proposition, nor without exacting payment, for the purposes of revenue, of an amount supposed to be equal to what would have been the taxes upon the property so exempted had the same been assessed in the ordinary way. This is apparent from the absence of such exemption in the *ad valorem* system (subd. 3, sec. 2, ch. 315, Laws of 1903), and its presence in the license system. The license system, so called, was manifestly resorted to by reason of the seeming necessity of taxing the property of each railway company as a unit and the difficulty of so taxing such property, as experienced in the *ad valorem* case decided herewith (*post,* p. 553).

I am willing to subscribe to the proposition that in enacting ch. 315, Laws of 1903, providing for the "taxation of railroad companies" by the *ad valorem* method, the legislature was under the limitations imposed by the uniformity clause of the constitution; but I am unwilling to subscribe to the

proposition, now advanced, that in exacting the corresponding millions of money annually from the same companies under the license system, which so prevailed prior to that enactment, the legislature was under no limitation by reason of the uniformity clause of the constitution. The purpose of each of the two methods was to secure a corresponding amount of revenue for the use of the state. To hold that the enactment of the one method was subject to such constitutional limitation and that the enactment of the other was not is to hold that the legislature by the choice of methods may determine whether such constitutional restriction shall or shall not be operative. To so hold, in my judgment, is to place form above substance, and to deprive citizens and taxpayers of the protection heretofore supposed to have been secured by such constitutional restriction. If the legislature may rightfully exercise such unlimited power to make exactions from the income of railway companies, then I do not perceive why the legislature may not exercise unlimited power in making similar exactions from the income of other property by a similar method. Can it be that the legislature can exempt from taxation all property producing an income, and then in lieu of such exemption exercise unlimited power in exacting a percentage of such income through the so-called license system?

This opinion is written in no spirit of controversy, but merely to relieve myself from responsibilities which otherwise I would necessarily share, not only in the decision of this case, but also in the decision of the case of *Chicago & N. W. R. Co. v. State, post,* p. 553, 108 N. W. 557, and *Nunnemacher v. State,* 129 Wis. ——, both of which are decided herewith.